**In re LAKES et al.**

[Cite as *In re Lakes,* 149 Ohio App.3d 128, 2002-Ohio-3917.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19028.

Decided Aug. 2, 2002.

Mathias H. Heck, Jr., Montgomery County Prosecuting Attorney, and Johnna M. Shia, Assistant Prosecuting Attorney, Appellate Division, for appellee Montgomery County Children Services.

C. Douglas Copley, for appellant Sarah Lakes.

WOLFF, Presiding Judge.

{¶ 1} In this case, Sarah Lakes appeals from a juvenile court judgment granting permanent custody of two of her children, Angela and Donald, to Montgomery County Children Services ("MCCS"). The trial court additionally awarded MCCS permanent custody of two other children (Richard and John), as well as the right to make planned permanent living arrangements for three more children (Charles, Joseph, and Timothy). Since appeals were not filed concerning the latter five children, only the cases of Angela and Donald are before us. The natural father, Carl Lakes, did not file an appeal.

{¶ 2} In support of her appeal, Mrs. Lakes raises the following assignments of error:

{¶ 3} "I. Trial Counsel's representation of Appellant fell below an objective standard of reasonableness and was ineffective assistance of counsel.

{¶ 4} "II. The trial court abused its discretion when it failed to appoint new counsel for Appellant to file objections to the magistrate's decision and allow current counsel to withdraw.

{¶ 5} "III. The State failed to present clear and convincing evidence to terminate the parental rights of Appellant and the trial court erred in finding that it did so.

{¶ 6} "IV. The record does not demonstrate that Appellant relinquished custody freely, knowingly and voluntarily with full knowledge of essential facts."

I

{¶ 7} MCCS's involvement with the Lakes family began in 1987. Subsequently, in September 1996, a neglect complaint was filed based on deplorably filthy conditions in the home. According to the complaint, both Mr. and Mrs. Lakes had been charged by the police with child endangerment. Mrs. Lakes had also allegedly entered a domestic violence shelter at one point, due to Mr. Lakes's threats to kill her. After MCCS worked with the parents on improving living conditions, the children were returned, and MCCS was granted protective supervision until May 1997. After the order of protective supervision expired, MCCS continued to be involved with the family.

{¶ 8} Eventually, on November 12, 1999, MCCS filed a motion for temporary custody. According to an affidavit filed with the motion, a caseworker had been refused entry when she went to the home on November 10, 1999. The landlord and police then became involved, and they were admitted. At that time, the children were found to be filthy. Conditions in the home were deplorable, with food and mold on dishes, roaches coming out of the freezer, etc. The family was

also three months behind in rent and was in the process of being evicted. Further, they had been sanctioned from benefits, with no income anticipated for several months.

{¶ 9} On November, 16, 1999, the court found that the children should be placed in shelter care. A guardian ad litem was then appointed for the children, and the public defender was appointed as counsel for the mother. Adjudicatory and dispositional hearings were set for December 17, 1999. Following the December 1999 adjudicatory and dispositional hearings, the court found the children dependent and granted MCCS temporary custody. According to the case plan, the goal was reunification. The parents received visitation once a week for two hours.

{¶ 10} Mrs. Lakes was given the following goals: provide proof of stable housing and stable employment, undergo parenting classes, complete a psychological assessment, enroll in and complete home-management classes, enroll with the Artemis (domestic violence) program to seek help, and complete all recommendations. Mr. Lakes was given similar goals, with the addition of enrolling in and completing anger-management class and a batterers' group.

{¶ 11} In April 2000, about four months after the hearings, MCCS filed a motion to suspend the parents' visitation. According to an affidavit filed with the motion, Mr. Lakes had not visited since January and Mrs. Lakes had failed to provide proper supervision during visits. The affidavit alleged that sexual abuse may have occurred during one visit, that the parents asked the children for money for food during a visit, and that the mother was unable to meet the children's needs. For example, during an April 10, 2000 visit, the children were out of control and the mother failed to intervene. A table fell onto one child, and he broke his wrist.

{¶ 12} The court suspended visitation on May 9, 2000, and set adjudicatory and dispositional hearings for June 1, 2000. However, these hearings were continued because service was not complete. Ultimately, the motion to suspend visitation was withdrawn because the parties agreed to visitation at the agency.

{¶ 13} On September 19, 2000, the agency filed a motion seeking permanent custody, based on the parents' failure to make substantial progress on the case plan. Eventually, after two continuances, the dispositional hearing was conducted by a magistrate on March 14, 2001. At that time, both Mr. and Mrs. Lakes appeared, with separate counsel. The MCCS attorney indicated that the parties had reached tentative agreement about the seven children. Specifically, Mrs. Lakes agreed to a planned permanent living arrangement for Charles, Joseph, and Timothy (then ages 17, 16, and 14), and permanent custody to MCCS of Angela, Donald, Richard, and John (ages 11, 6, 5, and 3), on the condition that the

agency agree to try to find open adoptive homes for Angela, Donald, Richard, and John. During this discussion, the following exchange occurred:

{¶ 14} "The Court: Understanding that the open adoption is not—cannot be legally guaranteed?

{¶ 15} "Ms. Rosario: Legally binding. Do you understand that, Sarah?

{¶ 16} "Mrs. Lakes: Yeah."

{¶ 17} This was the only time Mrs. Lakes spoke or was questioned during the hearing. After the parties outlined the agreement, the magistrate said he would have to take testimony anyway. Consequently, MCCS presented testimony from the caseworker about Mr. and Mrs. Lakes's progress on the case plan. The caseworker testified that Mr. Lakes had done very little and that Mrs. Lakes had also failed to make significant progress. Although Mrs. Lakes said she had completed parenting classes, she did not provide a certificate or written documentation, even though the caseworker had repeatedly asked for verification. Mrs. Lakes also did not complete education on domestic violence, nor had she attended any support groups on domestic violence. To the contrary, at one visitation, Mrs. Lakes appeared to have been severely beaten and said Mr. Lakes was responsible. At that time, MCCS called the YWCA to arrange a room, but Mrs. Lakes did not follow through. Both the caseworker and the guardian ad litem believed that Mr. and Mrs. Lakes were still together at the time of the hearing, even though a civil protection order had been issued against Mr. Lakes. The caseworker also testified that Mrs. Lakes's visitation had been cut off for several months and had been sporadic due to Mrs. Lakes working, being injured, or being sick. However, the caseworker did note that Mrs. Lakes had attended all but two or three visits in the past three or four months. She also commented on a positive bond between Mrs. Lakes and the children, and thought Mrs. Lakes should have contact with the children, even those being placed in the permanent custody of MCCS. And finally, the caseworker agreed that Mrs. Lakes had maintained stable housing and employment.

{¶ 18} Nonetheless, based on the parents' delay in completing the case plan, their history with the agency (dating back to 1987), and their lack of motivation regarding the children, the caseworker felt that MCCS should be awarded permanent custody of the four younger children and that a permanent planned living arrangement should be granted for the three older boys.

{¶ 19} On May 1, 2001, the magistrate's decision and judge's order were filed granting the motion for permanent custody and permanent planned living arrangement. The magistrate found that MCCS had made reasonable attempts to prevent removal, end removal, and make it possible for the children to return home, but that reunification was not possible. Subsequently, on May 15, 2001,

Mrs. Lakes filed general objections to the magistrate's decision and asked that a transcript be prepared. Mrs. Lakes also asked for a 30–day extension from the date the transcript was filed, so that she could supplement the objections. The transcript was filed on June 14, 2001, but no supplemental objections were ever filed. As a result, on July 26, 2001, MCCS asked the court to issue a decision on the objections. In this regard, MCCS noted that 41 days had passed after the transcript was filed, without any further response from Mrs. Lakes.

{¶ 20}   Thereafter, Mrs. Lakes did not file supplemental objections. Instead, on August 1, 2001, Mrs. Lakes filed (through her attorney), a motion asking for appointment of another attorney who was not employed by the Montgomery County Public Defender's Office. In a memorandum, the attorney pointed out that she had given Mrs. Lakes advice about resolving pending issues in the custody case. The attorney also stated that Mrs. Lakes might have a claim of ineffective assistance of counsel because she had originally agreed to the custody decision but now wanted to object.

{¶ 21}   A second, identical motion for appointment of new counsel was filed on August 10, 2001. However, the trial court did not rule on either motion. Instead, the court issued an entry and order on August 14, 2001, overruling the objections to the magistrate's decision. In the entry, the court noted that the objections were very general and did not present any legal or factual arguments. The court further stressed that Mrs. Lakes did not file supplemental objections and had not asked for any continuances.

{¶ 22}   After Mrs. Lakes filed a timely appeal, we remanded the case because the trial court had not formally adopted the magistrate's decision. The error was rectified through an amended trial court entry, and we then allowed the appeal to proceed.

## II

{¶ 23}   In her first assignment of error, Mrs. Lakes contends that she was the victim of ineffective assistance of counsel. She lists the incidents of alleged ineffective assistance as follows:

{¶ 24}   "1. Failure to make sure that appellant understood her rights.

{¶ 25}   "2. Failure to ensure that the magistrate questioned appellant about her rights.

{¶ 26}   "3. Failure to make sure that the motion requesting new counsel because of a conflict of interest, was timely filed with the clerk of courts.

{¶ 27} "4. Failure to follow up in a timely fashion to make sure that new counsel was appointed by the court. Trial counsel's responsibilities did not end until the court granted the request and issued an Order to that effect.

{¶ 28} "5. Failure to file timely supplemental objections when new counsel was not appointed.

{¶ 29} "6. Trial counsel's admission that her advice to appellant may have been erroneous and resulted in ineffective assistance to appellant."

{¶ 30} Claims of ineffective assistance of counsel are assessed against the two-part test of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. As stated in *State v. Madrigal* (2000), 87 Ohio St.3d 378, 388–389, 721 N.E.2d 52:

{¶ 31} "To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *Strickland* at 697, 104 S.Ct. at 2052, 80 L.Ed.2d at 674."

{¶ 32} We turn first to incidents 1, 2, and 6.

{¶ 33} The record does not support Mrs. Lakes's contention that her counsel failed to make sure Mrs. Lakes understood her rights. The fact that the magistrate did not question Mrs. Lakes as to her rights and Mrs. Lakes's terse response to her counsel's question fail to demonstrate that Mrs. Lakes was unaware of her rights or that her counsel had failed to make sure she understood them.

{¶ 34} Furthermore, Juv.R. 34, pertaining to dispositional hearings, does not require the court to engage in a colloquy with a parent in an R.C. 2151.414 proceeding, which this proceeding was, such as that required by Juv.R 29 at adjudicatory hearings. See *In re Janway* (Dec. 13, 2000), Montgomery App. No. 18264, 2000 WL 1838301. Counsel was, therefore, not derelict in not asking the magistrate to engage Mrs. Lakes in such a colloquy.

{¶ 35} Finally, Mrs. Lakes's counsel did not admit that her advice may have been erroneous. In her motion for appointment of different counsel, Mrs. Lakes's counsel stated:

{¶ 36} "The undersigned attorney for movant represented movant in a permanent custody trial regarding the above referenced children. The undersigned gave movant legal advice concerning the resolution of the pending issues. The

undersigned believes that movant may have an ineffective assistance of counsel claim as movant now wants to object to the decision of the court to which movant had originally agreed.

{¶ 37} "Therefore, movant believes there may be a conflict of interest if the Public Defender's Office continues to represent movant."

{¶ 38} This is not necessarily an admission of bad advice but just as likely a statement that Mrs. Lakes regrets following her counsel's advice, even though it may have been sound. Furthermore, counsel's statement lacks any specificity as to how her advice was erroneous, if indeed counsel thought her advice was deficient. Counsel did not say Mrs. Lakes had a viable claim of ineffective assistance but merely that she "may have," and that her continued representation of Mrs. Lakes "may be" a conflict of interest.

{¶ 39} Incidents 1, 2, and 6 do not pass the first prong of the *Strickland* test.

{¶ 40} Turning to incidents 3, 4, and 5, these incidents fail to pass prong two of the *Strickland* test. Assuming counsel believed she had a conflict of interest after Mrs. Lakes "apparently had a change of mind about relinquishing permanent custody," she should have moved well in advance of August 1 for appointment of successor counsel and followed up on that motion so that successor counsel could be appointed and file timely objections or obtain an extension of time within which to do so. If the court declined to appoint new counsel, counsel for Mrs. Lakes should have filed any arguably meritorious objections.

{¶ 41} But even assuming that Mrs. Lakes's counsel was derelict in these respects, the record fails utterly to demonstrate prejudice. As discussed below, MCCS proved its case for permanent custody by clear and convincing evidence, although the presentation of evidence was understandably abbreviated because, at the time of the dispositional hearing, Mrs. Lakes was agreeable to relinquishing custody.

{¶ 42} Nothing of record suggests any viable objections. Under these circumstances, Mrs. Lakes has not shown herself to have been prejudiced by any shortcomings of her counsel.

{¶ 43} The first assignment is overruled.

{¶ 44} Under her second assignment, Mrs. Lakes contends that the trial court abused its discretion in not appointing new counsel.

{¶ 45} As noted above, counsel moved for appointment of successor counsel because "there may be a conflict of interest if the Public Defender's Office continues to represent movant." This statement is utterly lacking in specifics, which in itself would be a basis for overruling the motion. In *State v. Carter*

(1998), 128 Ohio App.3d 419, 423, 715 N.E.2d 223, the Court of Appeals for Lawrence County stated:

{¶ 46} "The defendant bears the burden of announcing the grounds for a motion for appointment of new counsel. If the defendant alleges facts which, if true, would require relief, the trial court must inquire into the defendant's complaint and make the inquiry part of the record. *State v. Deal* (1969), 17 Ohio St.2d 17, 20, 46 O.O.2d 154, 155, 244 N.E.2d 742, 743–744; *State v. King* (1995), 104 Ohio App.3d 434, 437, 662 N.E.2d 389, 390–391; *State v. Prater* (1990), 71 Ohio App.3d 78, 83, 593 N.E.2d 44, 46–47. 'The inquiry may be brief and minimal, but it must be made.' *King, supra*, at 437, 662 N.E.2d at 390–391, citing *Prater, supra*. Even that limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further. See *State v. Deal, supra*, at 19, 46 O.O.2d at 155, 244 N.E.2d at 743." See, also, *In re Griffin* (Jan. 19, 2001), Montgomery App. No. 18432, 2001 WL 43106.

{¶ 47} Furthermore, assuming error in the trial court's failure to rule on the motion for new counsel, Mrs. Lakes must demonstrate prejudice. *Carter, Griffin*, supra. As we stated earlier, the record does not demonstrate any viable objections. Mrs. Lakes may have had second thoughts about her decision to agree to relinquish her parental rights, but that did not infect the dispositional hearing with error.

{¶ 48} The second assignment is overruled.

{¶ 49} In her third assignment, Mrs. Lakes contends that the trial court erred in finding that MCCS had carried its burden of proof by clear and convincing evidence. Lakes does not tell us how or why MCCS's evidence was deficient. We have examined the record of the dispositional hearing and are satisfied that the trial court could have reasonably determined that MCCS established its case for permanent custody by clear and convincing evidence.

{¶ 50} The third assignment is overruled.

{¶ 51} Under the fourth assignment, Mrs. Lakes contends that the record fails to demonstrate that she fully, knowingly, and voluntarily relinquished custody with full knowledge of essential facts.

{¶ 52} In support of this argument, she points to the facts (1) that the magistrate did not engage her in a colloquy to assess her level of understanding, (2) that she was not asked to verbalize her understanding of the proceedings, and (3) that she filed objections to the magistrate's decision that she claims demonstrates her lack of understanding of the proceedings.

{¶ 53} Taking these facts in reverse order, Mrs. Lakes's objections do not demonstrate that she did not understand the termination proceedings or the effect of her agreement to relinquish her parental rights. Indeed, nothing of record remotely suggests a lack of understanding. Indeed, on appeal, Lakes merely contends she changed her mind about relinquishing her parental rights.

{¶ 54} In *In re Janway*, supra, Montgomery App. No. 18264, we stated:

{¶ 55} "Janway's consent was not required for the termination of her parental rights pursuant to R.C. 2151.414. As such, we are unpersuaded that the trial court was under an obligation to inquire as to whether Janway had relinquished her parental rights knowingly and voluntarily."

{¶ 56} In *Janway*, we were confronted with a situation similar to the situation here: the MCCS was pursuing permanent custody because of the mother's inability to care for her child and "intended to terminate [the mother's] parental rights with or without her consent." After testimony by the caseworker, perfunctory because of the mother's agreement that her parental rights be terminated, the magistrate recommended that permanent custody be granted to MCCS. Thereafter, the mother had a change of heart about agreeing to the termination of her parental rights. Although she informed the trial court of her change of heart, the trial court nevertheless adopted the magistrate's recommendation that permanent custody be granted to MCCS. On appeal, we rejected the mother's contentions that she had not knowingly and voluntarily relinquished her parental rights because MCCS's effort to terminate the mother's parental rights did not depend upon her consent. The only reason we reversed was that the perfunctory testimony of the caseworker—which was perfunctory because the mother had agreed to the termination of her parental rights—did not provide clear and convincing evidence that granting custody to MCCS was in the child's best interest.

{¶ 57} The testimony of the caseworker here does not suffer from the same infirmity. Although not extensive, the caseworker's testimony covered over 30 pages of transcript and provided factual support for MCCS's motion for permanent custody. Counsel for both parents cross-examined the caseworker.

{¶ 58} The purpose of the adjudicatory hearing in a child-neglect case is to determine whether the neglect alleged is true. See Juv.R. 2(B). A finding of neglect places the child within the court's jurisdiction. The purpose of the dispositional hearing is to determine what action shall then be taken with respect to the child. Juv.R. 3(M).

{¶ 59} "The law commands that the proceedings be bifurcated into separate adjudicatory and dispositional hearings because the issues raised and the procedures used at each hearing differ. * * * The issue at the dispositional stage

involves a determination of what is in the child's best interests. There must be strict adherence to the Rules of Evidence at the adjudicatory stage. Yet, 'any evidence that is material and relevant, including hearsay, opinion and documentary evidence,' is admissible at the dispositional stage. Juv.R. 34(B)(2)." *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 233, 17 OBR 469, 479 N.E.2d 257.

{¶ 60} Adjudicatory hearings are governed by Juv.R. 29. Juv.R. 29(B)(2) requires the court to "[i]nform the parties of the substance of the complaint, the purpose of the hearing, and possible consequences of the hearing." Juv.R. 29(C) states:

{¶ 61} "Entry of admission or denial. The court shall request each party against whom allegations are being made in the complaint to admit or deny the allegations. A failure or refusal to admit the allegations shall be deemed a denial, except in cases where the court consents to entry of a plea of no contest."

{¶ 62} Juv.R. 29(D) requires the court to engage in a colloquy with a party who admits the allegations against him before the court accepts the admission. The requirement is similar to the provisions in Crim.R. 11(C) governing acceptance of pleas of guilty or no contest in criminal cases. Its purpose is to determine whether the admission is knowing, intelligent, and voluntary.

{¶ 63} Once an allegation is found to be true in the adjudicatory stage, the case then moves to the dispositional phase, which is governed by Juv.R. 34. The issue at that stage is the best interest and welfare of the child. *In re Pryor* (1993), 86 Ohio App.3d 327, 620 N.E.2d 973. The court must focus its disposition on providing for the care, protection, and mental and physical development of the child. See R.C. 2151.01(A) and (B). The court's dispositional alternatives, which are set out in Juv.R. 34(D) and R.C. 2151.353(A), are orders that do any of the following, alone or in combination:

{¶ 64} "(1) Place the child in protective supervision;

{¶ 65} "(2) Commit the child to the temporary custody of [an agency], either parent, a relative, * * * or a probation officer for placement in a foster home;

{¶ 66} "(3) Award legal custody of the child to either parent or any other person;

{¶ 67} "(4) Commit the child to the permanent custody of [an agency]; [or]

{¶ 68} "(5) Place the child in a planned permanent living arrangement."

{¶ 69} The colloquy which Juv.R. 29(D) prescribes at the adjudicatory stage is grounded on two principles. One is the fundamental right of personal choice in family matters, within which is the right of a parent to his or her natural children. *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 15 O.O.3d 3, 399 N.E.2d 66. The other is the due process protections afforded to fundamental

rights in juvenile proceedings. *In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527. The issue presented here is whether those considerations likewise apply to the subsequent dispositional proceeding, so as to require a colloquy similar to that in Juv.R. 29(D) when a parent "admits" that it is in his or her child's best interest to be placed permanently with another person or an agency instead of remaining with the parent.

{¶ 70} In a neglect case, the juvenile court may proceed to find neglect at the adjudication stage upon the admission of the parent charged. No other evidence is required, even when the standard is clear and convincing evidence. *In re Schmidt* (1986), 25 Ohio St.3d 331, 25 OBR 386, 496 N.E.2d 952. At the dispositional stage, however, other evidence is surely required to determine whether a particular placement is in the child's best interest. See *In re Janway,* supra. The parent's "admission" that placement with another person is in the child's best interest thus lacks the conclusive effect of an admission of neglect at the adjudicatory phase.

{¶ 71} Lacking the effect of a plea to a charge, a parent's admission in a dispositional hearing that his or her child's best interest would be served by permanent placement elsewhere than with the parent is not a matter that requires protections similar to those in Juv.R. 29(D). The admission is but one more article of testimonial evidence for the court to consider in resolving the best-interest question. The court is entitled to credit the admission or discredit it, on the merits.

{¶ 72} Here, the children were adjudicated neglected in 1996. Protective supervision was ordered in subsequent dispositional proceedings, and that was in turn followed by temporary custody with the agency. In 1999, the agency moved for permanent custody. It was in the dispositional hearing on that request that Mrs. Lakes's agreement was put before the court. Though she conceded that granting the agency's request was in the children's best interest, the court's magistrate properly proceeded to hear other evidence on the issue before entering a permanent custody order. The court was not required to engage in a colloquy with Mrs. Lakes similar to that required by Juv.R. 29(D) or Crim.R. 11(C) before it either accepted her admission or entered its order.

{¶ 73} The fourth assignment is overruled.

{¶ 74} The judgment will be affirmed.

Judgment affirmed.

GRADY, J., concurs.

BROGAN, J., dissents.

BROGAN, Judge, dissenting:

{¶ 75}   I respectfully dissent from the majority opinion.

{¶ 76}   In the context of Civ. R. 53, we have held that we may not consider error in the lower court if a party fails to object to a magistrate's decision. *R.G. Real Estate Holding, Inc. v. Wagner* (April 24, 1998), Montgomery App. No. 16737, 1998 WL 199628, * 3. However, in *R.G. Real Estate,* we did say that plain error may still be considered. Id.

{¶ 77}   Like Civ. R. 53, Juv. R. 40(E)(3)(b) provides that "[a] party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding of fact or conclusion under this rule." Again, despite the wording of the rule, we have applied plain error in a juvenile proceeding. See *In re Martin* (Aug. 27, 1999), Montgomery App. Nos. 17432, 17461, 17464, 1999 WL 955519, * 4. Other appellate districts also apply the plain error doctrine in juvenile proceedings. See, e.g., *In re Etter* (1998), 134 Ohio App.3d 484, 492, 731 N.E.2d 694. Consequently, we will continue to consider plain error in those rare circumstances where " 'error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *R.G. Real Estate,* 1998 WL 199628, * 3, quoting *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099.

{¶ 78}   I think the error in the present case meets the above requirements. Many years ago, the Sixth District Court of Appeals stressed that "where parental rights are permanently terminated, it is of utmost importance that the parties fully understand their rights and that any waiver is made with full knowledge of those rights and the consequences which will follow." *Elmer v. Lucas Cty. Children Serv. Bd.* (1987), 36 Ohio App.3d 241, 245, 523 N.E.2d 540. In the context of adjudicatory hearings, Juv. R. 29(D)(1) specifically requires the court to determine before accepting admissions that a party "is making the admission voluntarily with understanding of the nature of the allegations and the consequences of the admission." Juv. R. 29(D)(2) goes on to require the court to determine the following:

{¶ 79}   "The party understands that by entering an admission the party is waiving the right to challenge the witnesses and evidence against the party, to remain silent, and to introduce evidence at the adjudicatory hearing."

{¶ 80}   In comparison, Juv. R. 34, which deals with dispositional hearings, does not contain a similar requirement. Nonetheless, the Fourth District Court of Appeals has found that substantial compliance with Juv. R. 29(D) is required for both adjudicatory and dispositional hearings in custody termination cases. *In*

*re Fennell* (Jan. 23, 2002), Athens App. No. 01CA45, 2002 WL 194221, * 6. In this regard, the Fourth District Court of Appeals focused on the fact that dispositional and adjudicatory hearings cannot be divorced from each other; and that the dispositional hearing is "entirely dependent on the adjudicatory phase." .Id.

{¶ 81}  I agree with the Fourth District's analysis.  The Ohio Supreme Court has described permanent termination of parental rights as " 'the family law equivalent of the death penalty in a criminal case.' "  *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45.  As a result, the court has stressed that "parents must be afforded every procedural and substantive protection the law allows."  Id. In this regard, we cannot think of a more telling "admission" than a parent's agreement to surrender all parental rights to a child.  Such protections are particularly critical in cases like the present, where the agency originally requested only temporary custody.  Thus, the Juv. R.29(D) procedure would have applied at a time when the parents were not faced with permanent loss of all parental rights, i.e., at the adjudicatory hearing where MCCS was given temporary custody. Logically, it makes little sense for courts to be more concerned about parental admissions in a temporary custody situation than when rights are being completely divested.

{¶ 82}  In the case of *In re Janway* (Dec. 13, 2000), Montgomery App. No. 18264, 2000 WL 1838301, we took a somewhat different view.  In *Janway*, a mother had consented to termination of parental rights at the permanent custody hearing, but later changed her mind.  She then claimed on appeal that the record failed to show that her consent was freely, knowingly, and voluntarily given.  Our first response to this argument was that we were unpersuaded that the trial court was obliged to inquire whether the surrender was voluntary.  2000 WL 1838301, * 2. However, we then focused on the fact that the mother was able to accurately summarize the effect of the termination of her rights at the hearing, when asked to do so.  Id. Even under these circumstances, we still reversed the grant of permanent custody, because the state called only one witness (a caseworker), who gave perfunctory testimony.  Id. at * 3.

{¶ 83}  In contrast to *Janway*, Mrs. Lakes was not asked in this case to summarize the effect of the termination of her rights.  Furthermore, *Janway* was decided before the decision in *Fennell*.  As a final point, I would note that the testimony in the present case was less perfunctory than the testimony in *Janway*. Accordingly, since the record fails to reveal that Mrs. Lakes relinquished custody freely, knowingly, and voluntarily, the fourth assignment of error is should be sustained.