### In re B.M.

[Cite as *In re B.M.*, 181 Ohio App.3d 606, 2009-Ohio-1718.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

No. 2008–G–2868.

Decided April 10, 2009.

21. *Galatis*, at ¶ 58, quoting *Robinson v. Detroit* (2000), 462 Mich. 439, 466, 613 N.W.2d 307.

22. Id.

608

Barthol & Staley, L.P.A., and Anita B. Staley, for appellant, Kenton Miller.

David P. Joyce, Geauga County Prosecuting Attorney, and Craig A. Swenson, Assistant Prosecuting Attorney, for appellee, Geauga County Department of Job and Family Services.

Stephanie Radcliffe, Guardian ad litem.

———

TIMOTHY P. CANNON, Judge.

{¶ 1} Kenton Miller appeals from the judgment of the Geauga County Court of Common Pleas, Juvenile Division, terminating his parental rights with his minor daughters. For the following reasons, we affirm the judgment of the trial court.

{¶ 2} B.M. (born in 1999) and K.M. (born in 2001) are the children of Kenton and Crystal Miller. It appears that the Millers' marriage broke down in 2005. Crystal briefly had custody of the girls, before turning them over to the sole care of Kenton. Her contact with the girls has been virtually nonexistent since then. At the October 16, 2008 hearing in this matter, she voluntarily surrendered her parental rights, citing severe depression as the cause.

{¶ 3} On October 25, 2006, the Geauga County Department of Job and Family Services ("GCDJFS") filed a complaint alleging that B.M. and K.M. were neglected, pursuant to R.C. 2151.03(A)(2), and dependent, pursuant to R.C. 2151.04(B) and (C). At the time, Kenton and the girls were homeless, living with Kenton's girlfriend in Chardon. It appears that Kenton was unemployed and suffering from stress, for which he refused counseling. He further admitted to his family's social worker that he smoked marijuana.

{¶ 4} On November 8, 2006, GCDJFS filed a case plan, identifying various problems Kenton needed to address, including finding stable housing and employ-

ment and addressing his substance abuse and anger-related issues. The goal of the case plan was to keep the Miller girls with their father.

{¶ 5} On November 22, 2006, at a pretrial, Kenton pleaded true to an amended complaint alleging his daughters to be dependent, pursuant to R.C. 2151.04(C). On December 12, 2006, the trial court appointed a guardian ad litem for the Miller girls. She filed her first report on January 5, 2007, noting that Kenton had found an apartment, but was still unemployed, was refusing to cooperate with caseworkers regarding his substance abuse and anger issues, and was refusing to get proper counseling for B.M. She noted that Kenton and the girls were devoted to each other.

{¶ 6} By a judgment entry filed January 8, 2007, the trial court found B.M. and K.M. to be dependent, pursuant to R.C. 2151.04(C); granted Kenton legal custody of the girls, under protective supervision of GCDJFS; and ordered an amended case plan. The latter was filed on January 29, 2007.

{¶ 7} On April 18, 2007, GCDJFS filed a show-cause motion against Kenton, for various violations of the amended case plan, including failure to obtain a counseling assessment for B.M., failure to find work, failure to follow his counseling assessment, and failure to obtain a drug and alcohol assessment. That same day, Kenton filed a motion for permission to move to Florida, to live with his brother and sister-in-law. Subsequently, the trial court ordered Kenton to appear and show cause for his failures to abide by the amended case plan. On April 23, 2007, the guardian ad litem filed another report, recommending that temporary custody of B.M. and K.M. be given to GCDJFS, until Kenton started complying with the amended case plan.

{¶ 8} Following a review hearing on April 25, 2007, the trial court filed a judgment entry giving temporary custody of the Miller girls to GCDJFS and ordering Kenton to cooperate in turning the girls over. That same day, GCDJFS moved the trial court to issue a warrant for Kenton's arrest, when it could not find either girl. The trial court immediately issued the warrant. Kenton was arrested and, by a judgment entry filed April 30, 2007, the trial court found him to be in contempt and committed him to 30 days in jail. Kenton was allowed to purge himself of contempt by promising to cease harassing the social workers and to follow the court-ordered visitation schedule. The girls were placed in foster care; Kenton was given a minimum of two hours' supervised visitation per week.

{¶ 9} On July 18, 2007, Kenton moved to have custody of his daughters restored to him. The guardian ad litem's report filed July 20, 2007, in preparation for the review hearing set for July 25, noted that Kenton had found a job, but still lacked housing and was living with a girlfriend. It further noted his continued abuse of marijuana and inability to control his anger. A psychiatric

evaluation was recommended, as was continuing custody of B.M. and K.M. with GCDJFS and foster care.

{¶ 10} The record indicates a general improvement in Kenton for approximately a year. However, in her April 11, 2008 report, the guardian ad litem suggested identifying a permanent home for B.M. and K.M., in the event reunification with Kenton could not be achieved. At this time, Kenton was still having problems obtaining stable housing and employment, as well as reliable transportation.

{¶ 11} By the time she filed her report of July 15, 2008, the situation had deteriorated. Kenton had tested positive for methamphetamines, was in danger of losing his housing, and was failing to attend his individual counseling. Worried that the continued instability of their lives could result in permanent damage to B.M. and K.M., the guardian ad litem recommended canceling the attempt at reunification.

{¶ 12} Following a review hearing held July 17, 2008, the trial court filed a judgment entry on July 23. Noting that the period of temporary custody would expire in October 2008, the trial court ordered GCDJFS to prepare a plan for permanency for the Miller girls. Noting that Kenton's brother and sister-in-law had expressed interest in obtaining custody of the girls, the trial court ordered GCDJFS to expedite an interstate-compact home study with the responsible Florida authorities.

{¶ 13} On August 11, 2008, GCDJFS moved the trial court for permanent custody of B.M. and K.M. On August 14, 2008, the trial court appointed separate counsel for the girls and set a hearing for October 16, 2008. On October 2, 2008, the trial court appointed a new guardian ad litem. She filed her report on October 10, 2008. In it, she noted that Kenton had been admitted to Northcoast Behavioral Center on August 4, 2008, after text messaging a former girlfriend a picture of himself with a gun in his mouth. Kenton denied being suicidal, but admitted to feeling depressed due to his separation from his daughters. He also tested positive for marijuana. Northcoast diagnosed Kenton with major depressive disorder and marijuana abuse. Kenton was released August 12, 2008. The guardian ad litem further noted that he had missed various visitations recently and displayed unpredictable and agitated behavior. While admitting that the girls loved Kenton and wished to be with him, the guardian ad litem nevertheless recommended terminating Kenton's parental rights.

{¶ 14} On October 14, 2008, GCDJFS moved the trial court to combine Crystal Miller's voluntary surrender of her parental rights with the permanent-custody hearing. The trial court granted the motion that same day.

{¶ 15} The October 16, 2008 hearing commenced with the trial court explaining to Crystal Miller the aspects and consequences of her voluntary surrender of parental rights. Crystal signed the surrender documents in open court. A recess was taken. When court resumed, it transpired that Kenton had decided that morning to consider the voluntary relinquishment of his own parental rights and had commenced the process. Further, all the parties, through counsel, entered stipulations, which were read into the record. The purpose of the stipulation of facts was to provide the trial court with an evidentiary basis for deciding the permanent-custody motion, if Kenton decided not to surrender his parental rights.

{¶ 16} The parties stipulated to ten exhibits. These included (1) Kenton's certificate for completing a parenting class, (2) an assessment of Kenton by David Sardis, the therapist he had seen at Ravenswood, (3) hair drug panels from Kenton analyzed by Omega Laboratories, (4) four drug tests of Kenton from Omega Laboratories, (5) a picture received by Kenton's ex-girlfriend August 4, 2008, the day he was admitted to Northcoast Behavioral Center, (6) a letter from B.M. and K.M.'s counselor, Marianna Macey, and (7) that counselor's payment history.

{¶ 17} The parties further stipulated to the report of the guardian ad litem filed October 10, 2008.

{¶ 18} The parties stipulated that a complaint had been filed October 25, 2006 and that Kenton had pleaded true to the amended complaint. They stipulated that GCDJFS had possessed temporary custody of B.M. and K.M. since April 25, 2007. They stipulated that Kenton had custody of the girls from 2005 until GCDJFS took custody.

{¶ 19} The qualifications of various experts for the state, including Susie Breedlove, who undertook Kenton's alcohol and drug assessment, Patrolman DeLisa, who had taken Kenton to Ravenswood in August, and a technician from Omega Laboratory, were stipulated to. The parties stipulated that Breedlove would testify that Kenton was cannabis dependent and that Patrolman DeLisa would testify that Kenton stated he was depressed about losing his children, apartment, girlfriend, and job.

{¶ 20} The parties stipulated that Kenton had completed an anger-management class, but they also stipulated to the numerous instances of his balking at counseling, or failing to carry through with it. They stipulated to the special needs of his daughters for counseling and that Kenton, while originally resistant, had finally become more cooperative. They stipulated regarding K.M.'s special educational needs. They stipulated that Kenton met the criteria for adjustment disorder with depressive symptoms.

{¶ 21} The parties stipulated to the financial aid given to Kenton, in the form of gas cards, transit passes, and cards to Giant Eagle. They stipulated that he was difficult to reach by phone, which service was often turned off. They stipulated that at certain times, when he had free access to his daughters by telephone, he rarely called. They stipulated that the girls' first foster father would testify to the numerous times he had to transport the girls, due to Kenton's unreliable transportation. They stipulated that Kenton acted appropriately with his daughters when he was allowed unsupervised visitation, but that such visitation was cancelled in May 2008 when he screened positive for drugs.

{¶ 22} The parties stipulated that Kenton had been late for, or cancelled, numerous visitations in September and October 2008. They stipulated that the lead case worker, Ms. Prohaska, no longer did home visits with Kenton, due to his inability to control his anger. They stipulated that his supervised visits with his daughters were conducted with security present, due to the same problem. They stipulated that Prohaska did not presently know where he lived.

{¶ 23} The parties also stipulated that Kenton cared for K.M. appropriately at a medical appointment and that he had cared for her when she had open-heart surgery, several years earlier. They stipulated that his children wanted to be with him.

{¶ 24} Following entry of the stipulations upon the record, the girls' attorney put on the record that they wished to be returned to their father's custody. Closing arguments were made by counsel, and the trial court scheduled a hearing regarding Kenton's possible voluntary surrender of his parental rights.

{¶ 25} The trial court also noted that if, for any reason, there was not enough evidence in the record to consider all of the factors required by law, an additional hearing would be scheduled. However, if the trial court was able to rule on the pending motion for permanent custody based upon the evidence in the record, a decision would be rendered without an additional hearing.

{¶ 26} Kenton decided not to surrender his rights to his daughters. By a judgment entry filed October 30, 2008, the trial court terminated his parental rights, without a further hearing. Kenton timely noticed this appeal, assigning two errors:

{¶ 27} "[1.] The trial court erred in granting the motion for permanent custody as such decision was against the manifest weight of the evidence and resulted in a manifest miscarriage of justice.

{¶ 28} "[2.] Appellant was denied the effective assistance of trial counsel as guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution."

{¶ 29} We recognize that the termination of parental rights is "the family law equivalent of the death penalty." *In re Phillips*, 11th Dist. No. 2005–A–0020, 2005-Ohio-3774, 2005 WL 1714181, at ¶ 22, citing *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, at ¶ 14. This court has stated that a parent is entitled to "fundamentally fair procedures in accordance with due process provisions under the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution." *In re Sheffey*, 167 Ohio App.3d 141, 2006-Ohio-619, 854 N.E.2d 508, at ¶ 21.

{¶ 30} By his first assignment of error, Kenton argues that the judgment terminating his parental rights was against the manifest weight of the evidence. He presents two issues for review under this assignment of error. First, he contends that the stipulations presented to the trial court did not rise to the level of clear and convincing evidence that the grant of permanent custody of his daughters to GCDJFS was in their best interest. Second, he contends that the trial court erred by failing to advise him, on the record, of the rights he waived by presenting the case through stipulation, rather than by trial.

{¶ 31} " '[J]udgments supported by competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279 [8 O.O.3d 261, 376 N.E.2d 578], syllabus. We must indulge every reasonable presumption in favor of the lower court's judgment and finding of facts. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77 [10 OBR 408, 461 N.E.2d 1273]. In the event the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. See *Ross v. Ross* (1980), 64 Ohio St.2d 203 [18 O.O.3d 414, 414 N.E.2d 426].' " *In re S.Y.*, 11th Dist. No. 2008–A–0023, 2008-Ohio-4512, 2008 WL 4116088, at ¶ 20.

{¶ 32} When a motion for permanent custody is filed pursuant to R.C. 2151.413, the trial court must set the matter for hearing. R.C. 2151.414(A)(1). R.C. 2151.414(B)(1) provides:

{¶ 33} "[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

{¶ 34} " * * *

{¶ 35} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *."

{¶ 36} In determining the best interest of the child pursuant to R.C. 2151.414(B)(1), a trial court must consider the factors set forth at R.C. 2151.414(D):

{¶ 37} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶ 38} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶ 39} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

{¶ 40} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶ 41} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

▌ {¶ 42} Kenton first argues that evidence presented by stipulation cannot, as a matter of law, rise to the level of clear and convincing evidence, which is the measure of proof required for a best interest of the child determination pursuant to R.C. 2151.414(B)(1). "Clear and convincing evidence" is "the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is an intermediate standard * * * being more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." *State v. Ingram* (1992), 82 Ohio App.3d 341, 346, 612 N.E.2d 454.

{¶ 43} We respectfully disagree. In *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, at ¶ 40, the Supreme Court of Ohio quoted with approval the observation of the court in *Southdale Ctr., Inc. v. Lewis* (1961), 260 Minn. 430, 434, 110 N.W.2d 857, that a stipulation " 'has the same force and effect * * * as testimony.' " The Supreme Court of Ohio further quoted the following regarding a stipulation: " '[i]t is, in truth, a substitute for evidence, in that it does away with the need for evidence.' " *Turner* at ¶ 40, quoting 9 Wigmore, Evidence (Chadbourn Rev.1981) 821, Section 2588. Since a stipulation has the same force and effect as testimony, it may, depending on the nature of the matter or matters stipulated, rise to the level of clear and convincing evidence.

{¶ 44} Next, Kenton argues that, even if stipulations can rise to the level of clear and convincing evidence, the stipulated facts in this case fail to warrant termination of his parental rights. GCDJFS counters that the record and stipulations contain sufficient competent, credible evidence on each element required for a change in permanent custody pursuant to R.C. 2151.414.

{¶ 45} We agree with GCDJFS. The stipulations contained sufficient clear and convincing evidence to support the trial court's judgment.

{¶ 46} Pursuant to R.C. 2151.414(D)(1), the child's interaction with others, the record established that Kenton and his daughters love one another. However, the record also established that the girls have emotional and developmental needs that can only be addressed in a stable home environment, which Kenton has been unable to provide. The record further established that Kenton was poor about telephoning his daughters, even when allowed to do so freely; that, due to his drug problem, he was unable to maintain unsupervised visitation; and that following his hospitalization, he became erratic and unpredictable about visiting his daughters, and could only be trusted to do so in a secure environment.

{¶ 47} Pursuant to R.C. 2151.414(D)(2), dealing with the wishes of the child regarding custody, the record clearly established that B.M. and K.M. wished to be with Kenton, but the guardian ad litem urged termination of his parental rights.

{¶ 48} Pursuant to R.C. 2151.414(D)(3), the custodial history of the Miller girls is fully established; particularly, the fact that Kenton surrendered temporary custody to GCDJFS in April 2007 and has been unable to regain it.

{¶ 49} Pursuant to R.C. 2151.414(D)(4), whether a legally secure placement can be made without surrender of permanent custody, the record establishes that B.M. and K.M. have educational and emotional needs that can only be addressed in a stable environment. The record establishes that Kenton has been unable to find stable housing, work, or transportation and that he has difficulty correcting his drug abuse and treating his depression. Indeed, the record establishes that at the time of the permanent-custody hearing in this matter in October 2008, Kenton was jobless and homeless, which are the same problems that led to the filing of the original complaint in October 2006.

{¶ 50} Based on the record, the trial court's judgment was not against the manifest weight of the evidence, there being competent, credible evidence of a clear and convincing nature on each element of the case.

{¶ 51} Under his first assignment of error, Kenton also argues that the trial court violated his due process rights because the trial court failed to ask him if he understood that (1) he was waiving his right to a fair trial, (2) he was waiving his right to cross-examine witnesses, (3) he was waiving the right to

present evidence regarding the best interest of the children, and (4) he was stipulating to the evidence presented at the hearing. We construe Kenton's argument to claim that the trial court violated Juv.R. 29(D), which provides:

{¶ 52} "The court * * * shall not accept an admission without addressing the party personally and determining both of the following:

{¶ 53} "(1) The party is making the admission voluntarily with understanding of the nature of the allegations and the consequences of the admission;

{¶ 54} "(2) The party understands that by entering an admission the party is waiving the right to challenge the witnesses and evidence against the party, to remain silent, and to introduce evidence at the * * * hearing."

{¶ 55} The Eighth District Court of Appeals, in an analogous case, overruled the appellant's sole assignment of error, determining that the trial court was not required to follow the provisions as outlined in Juv.R. 29 when "addressing [the] appellant and determining whether she understood the consequences of her consent to the motion for permanent custody and the rights she was waiving." *In re L.D.,* 8th Dist. No. 81397, 2003-Ohio-2471, 2003 WL 21101101, at ¶ 9. The Eighth District stated:

{¶ 56} "Juv.R. 29 applies to adjudicatory hearings and sets forth the procedures to be followed by a trial court upon the filing of a complaint and its resolution by admission. * * *

{¶ 57} "The adjudicatory hearing in [*In re L.D.*] was held in March 2000, when the trial court determined that appellant's children were neglected and placed them in the temporary custody of CCDCFS. The subsequent motion filed by CCDCFS was a motion to modify temporary custody to permanent custody, filed pursuant to R.C. 2151.413 and 2151.414. Such proceedings are governed by Juv.R. 34, which specifically provides that:

{¶ 58} " 'Hearings to determine whether temporary orders regarding custody should be modified to orders for permanent custody shall be considered dispositional hearings and need not be bifurcated.' Juv.R. 34(I).

{¶ 59} "Because the hearing regarding the motion to modify temporary custody to permanent custody was a dispositional hearing, rather than an adjudicatory hearing, Juv.R. 29 did not apply." Id. at ¶ 6–9. See also *In re Lakes,* 149 Ohio App.3d 128, 2002-Ohio-3917, 776 N.E.2d 510, at ¶ 34 (holding the trial court was not required "to engage in a colloquy with a parent in an R.C. 2151.414 proceeding, * * * such as that required by Juv.R. 29 at adjudicatory hearings").

{¶ 60} In the instant case, Juv.R. 29(D) was inapplicable to the October 16, 2008 hearing. The adjudicatory hearing was held on November 27, 2006. Thereafter, GCDJFS filed a motion for permanent custody, pursuant to R.C.

2151.413.  As stated, the purpose of the stipulation of facts on October 16, 2008 was to provide the trial court with an evidentiary basis for deciding the *motion for permanent custody,* if Kenton decided not to surrender his parental rights.

{¶ 61} Second, the facts of this case demonstrate that the trial court personally addressed Kenton, who was present at the hearing with counsel.  The trial court informed Kenton that it was statutorily required to wait a period of time before it "can even consider accepting a voluntary, permanent surrender."  Moreover, the trial court informed Kenton that he was "under no obligation to execute a voluntary, permanent surrender" and, if he does not execute a voluntary, permanent surrender, the trial court may not hold an additional hearing on the motion for permanent custody.  In addition, it is clear from the record that Kenton had the ability to clarify and question the stipulations read into the record.  In fact, Kenton's counsel was given the opportunity to argue that the motion for permanent custody should be denied based on the stipulated evidence, in the event that he did not voluntarily surrender his parental rights.

{¶ 62} Based on the foregoing, Kenton was not deprived of his due process rights, and the first assignment of error is without merit.

{¶ 63} By his second assignment of error, Kenton alleges that he was denied effective assistance of counsel, as guaranteed by both the federal and state Constitutions.  We disagree.

{¶ 64} The guarantees of due process and equal protection of the law enshrined in our federal and state Constitutions require that indigent parents be provided counsel in termination of parental rights proceedings.  *In re Roque,* 11th Dist. No. 2005–T–0138, 2006-Ohio-7007, 2006 WL 3833860, at ¶ 7.

{¶ 65} "Effective counsel is one who ' * * * plays the role necessary to ensure that the trial is fair.'  *Strickland v. Washington* (1984), 466 U.S. 668, 685 [104 S.Ct. 2052, 80 L.Ed.2d 674].  ' * * * (A) fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding.'  Id.  Hence, '(t)he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'  Id. at 686 [104 S.Ct. 2052, 80 L.Ed.2d 674].

{¶ 66} "In *United States v. Cronic* (1984), 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657, the Supreme Court held that a per se violation of the right to counsel exists ' * * * when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.'  Id. at 659 [104 S.Ct. 2039, 80 L.Ed.2d 657], fn. 25.  The court further observed there may be ' * * * some occasions when although counsel is available to assist the accused

during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without any inquiry into the actual conduct of the trial.' Id. at 659–660 [104 S.Ct. 2039, 80 L.Ed.2d 657].

{¶ 67} "When presented with ineffective assistance of counsel claims in proceedings to terminate parental rights, Ohio courts apply the two-prong *Strickland* test. [*In re*] *Ridenour* [11th Dist. Nos. 2004–L–168, 2004–L–169, and 2004–L–170, 2005-Ohio-349, 2005 WL 237332,] at ¶ 9. To demonstrate ineffective assistance of counsel, a party ' * * * must show that counsel's performance was deficient and * * * that the deficient performance was so serious as to deprive [her] of a fair trial, a trial whose result is reliable.' *In re Colbert* (Nov. 9, 2000), 11th Dist. No. 2000–A–0028 [2000 WL 1687602, at *3], citing *State v. Post* (1987), 32 Ohio St.3d 380, 388 [513 N.E.2d 754]. In evaluating such claims, an appellate court must determine whether counsel's performance fell below an objective standard of reasonableness, and whether prejudice resulted. *State v. Bradley* (1989), 42 Ohio St.3d 136 [538 N.E.2d 373], paragraph two of the syllabus. Prejudice exists when 'the result of the trial would have been different' but for counsel's ineffectiveness. Id. at paragraph three of the syllabus. Courts must always recall that properly-licensed counsel is presumed competent, *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 301 [31 O.O.2d 567, 209 N.E.2d 164]; and, that trial counsel must be afforded deference regarding trial strategy. *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585 [805 N.E.2d 1042], at ¶ 52." *Roque*, 2006-Ohio-7007, 2006 WL 3833860, at ¶ 9–11.

{¶ 68} In this case, Kenton has not set forth evidence that would meet the first prong of *Strickland* and, therefore, has not demonstrated a claim for ineffective assistance of counsel. As stated, the trial court was not required to engage in a colloquy with Kenton, pursuant to Juv.R. 29(D). The October 16, 2008 hearing on the motion for permanent custody was a dispositional hearing, not an adjudicatory hearing. Counsel's decision to allow facts to be entered into the record by stipulation may have been, under the circumstances, sound trial strategy. There is nothing in the record that suggests there was anything stipulated to that was not accurate. Because the witnesses were all present and prepared to testify to the stipulated facts, it is hard to imagine how this prejudiced Kenton. Furthermore, although the evidence was based on the parties' stipulations, the record demonstrates that throughout the proceedings, Kenton's counsel advocated that the motion for permanent custody should be denied based upon the stipulated evidence. Moreover, as we have previously held, the record in the instant case demonstrates that the trial court's decision in terminating Kenton's parental rights was supported by clear and convincing evidence.

{¶ 69} The second assignment of error is without merit.

{¶ 70} For the reasons stated in the opinion of this court, Kenton's assignments of error are without merit, and it is the judgment and order of this court that the judgment of Geauga County Court of Common Pleas, Juvenile Division, is hereby affirmed.

Judgment affirmed.

RICE, J., concurs.

O'TOOLE, J., dissents.

COLLEEN MARY O'TOOLE, Judge, dissenting.

{¶ 71} As I find merit in each of Kenton's assignments of error, I would reverse and remand. Kenton was denied his due process rights when the trial court failed to advise him of the effect of entering the stipulations. His counsel was ineffective for allowing the stipulations to be made.

{¶ 72} First, I disagree with the majority that Juv.R. 29(D) was inapplicable to this case. The motion for permanent custody filed by GCDJFS was, in effect, a new complaint. Consequently, the hearing in the trial court on it was both adjudicatory, and dispositional. The stipulations entered at the October 16, 2008 hearing were in the nature of admissions. Consequently, the trial court was bound by the dictates of Juv.R. 29(D) at this permanent custody hearing. See e.g. *In re C.P.*, 8th Dist. No. 91393, 2008-Ohio-4700, 2008 WL 4263317, at ¶ 10–11, 18–24. See also *In re Foresha/Kinkel Children*, 5th Dist. No.2003CA00364, 2004-Ohio-578, 2004 WL 237987, at ¶ 5–15 (stipulation entered by father to terminate his parental rights complied with Juv.R. 29(D)).

{¶ 73} As the Court of Appeals for the Eighth Appellate District recently noted:

{¶ 74} "When a constitutional right is involved, as is the case here, the law requires strict compliance, and the failure of the trial court to advise a parent of a constitutional right is, per se, prejudicial. *In re Onion*, 128 Ohio App.3d 498 [715 N.E.2d 604]. This court has held that when a constitutional right is involved, such as in cases involving termination of parental rights, a trial court's failure to comply with Juv.R. 29(D) has been found to constitute plain error. *In re A.C.*, 160 Ohio App.3d 457, 2005-Ohio-1742, 827 N.E.2d 824, at ¶ 24.

{¶ 75} "As recently stated by this court in *In re L.C.*, Cuyahoga App. No. 90390, 2008-Ohio-917 [2008 WL 597617], 'Juv.R. 29(D) places an affirmative duty upon the Juvenile Court. Prior to accepting a parent's admission, the Juvenile Court must personally address the parent appearing before the court and determine that the parent, and not merely the attorney, understands the nature

of the allegations and the consequences of entering the admission. The trial court is required to make careful inquiries in order to ensure that the party's admission is voluntary, intelligent, and knowing.' Id. at ¶ 23.

{¶ 76} "A trial court's failure to substantially comply with Juv.R. 29(D) 'constitutes prejudicial error that requires a reversal of the adjudication in order to permit the party to plead anew. We review whether a court has substantially complied with Juv.R. 29(D) de novo.' *In re L.C.* at ¶ 24.

{¶ 77} "*In re M.C.*, Cuyahoga App. Nos. 85054 and 85108, 2005-Ohio-1968, 2005 WL 977832, this court reversed an adjudication of neglect and an award of permanent custody when the trial court failed to inform the parent and grandparent that by entering an admission under Juv.R. 29, they were admitting to the truth of the allegations in the amended complaint and to a finding of neglect and that they were giving up rights that applied to the adjudicatory hearing.

{¶ 78} "In the case sub judice, as in *In re M.C.*, the trial court failed to personally address S.F. and inform him that by entering admissions, he was admitting to the truth of the allegations in the amended complaint and to the respective adjudicatory findings. In fact, the court, in a manner similar to that of the one in *In re Beechler*, 115 Ohio App.3d, 567, 571 [685 N.E.2d 1257], (dealing with a review of Juv.R. 29 explanation of rights in the context of a delinquency case) focused on the responses of the attorney rather than the actual party giving up his or her rights.

{¶ 79} " 'This rule places an affirmative duty upon the juvenile court. Prior to accepting an admission, the juvenile court must personally address the actual party before the court and determine that that party, and not merely the attorney, understands the nature of the allegations and the consequences of entering the admission. Furthermore, the test for the accused delinquent's understanding of the charges is subjective, rather than objective, in that it is not sufficient that a hypothetical reasonable party would understand. The person actually before the court must do so.' Id. at [571, 685 N.E.2d 1257].

{¶ 80} "Most critically, the trial court failed to inform S.F. that he was giving up rights that applied not only to the adjudicatory and dispositional hearing, but more importantly, to the final dispositional hearing, resulting in termination of his parental rights. * * *

{¶ 81} " * * *

{¶ 82} " * * *

{¶ 83} "S.F. was not told that by entering into the admissions that the trial court would not only make a determination with respect to the adjudicatory status of the children and temporary custody, but that those findings could be used against S.F. at a later time if the agency sought permanent custody of the

children, which is exactly what happened when S.F. relapsed and experienced difficulties stemming from the relapse." *In re H.F.*, 176 Ohio App.3d 106, 2008-Ohio-1627, 890 N.E.2d 341, at ¶ 35–41, reversed on other grounds and cause remanded by *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607.

{¶ 84} In this case, Kenton was never advised of the rights he was waiving by entering the stipulations. The trial court addressed his attorney, not him. In the alleged "colloquy" relied upon by the majority, the trial court merely inquired of Kenton whether he understood that by entering the stipulations, he might waive the right to a further hearing, and what would be a good day to schedule a hearing if he chose to voluntarily surrender his rights. This was grossly insufficient.

{¶ 85} And even if Juv.R. 34(I) is applied, the colloquy between the trial court and Kenton in this case was insufficient. This is made clear by one of the cases cited by the majority, *In re L.D.*, 8th Dist. No. 81397, 2003-Ohio-2471, 2003 WL 21101101. In that case, the Eighth District did hold that a full Juv.R. 29 colloquy was not required at a permanent custody hearing. Id. at ¶ 9. However, the trial court engaged in a lengthy discussion, on the record, with appellant and her attorney, discussing fully the rights she was waiving. Id. at ¶ 4. Indeed, on appeal, she conceded that " 'the trial court [did] an excellent job of reviewing [her] rights that she [was] waiving and the meaning and significance thereof' before accepting her consent to the agency's motion for permanent custody." Id. at ¶ 5.

{¶ 86} In this case, Kenton was not advised of any of his rights. This was plain error and prejudicial error. Kenton was deprived of his due process rights.

{¶ 87} Further, the majority's opinion, as issued today, conflicts with the balance of authority from the Eighth District Court of Appeals, as set forth in *In re C.P.* and *In re H.F.*, as well as that from the Fifth District Court of Appeals, *In re Foresha/Kinkel Children*.

{¶ 88} I further disagree with the majority's conclusion that Kenton's counsel was not ineffective. Each prong of the *Strickland* test is clearly met. See *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 89} The first prong of *Strickland* is met: the performance of Kenton's trial counsel was objectively unreasonable. The termination of parental rights is the civil equivalent of the death penalty: it is difficult to imagine effective counsel, in a capital case, allowing his or her client to be tried solely by stipulation, without the cross-examination of witnesses, or any testing of the state's case. Further, she did not object to the trial court's failure to engage in an effective colloquy with Kenton regarding the rights he waived by entering the stipulations.

{¶ 90} The second prong of the *Strickland* test is met: "essential due process rights cannot simply be waived away." *In re Roque*, 11th Dist. No.2005–T–0138, 2006-Ohio-7007, 2006 WL 3833860, at ¶ 13, citing *In re Salsgiver*, 11th Dist No. 2002–G–2477, 2003-Ohio-1206, 2003 WL 1193784, at ¶ 29. By allowing her client's most precious right—that of raising his daughters—to depend solely on stipulated evidence, Kenton's counsel did waive his due process rights. "A decision based on clear and convincing evidence requires overwhelming facts * * *." *In re Williams*, 11th Dist. Nos. 2003–G–2498 and 2003–G–2499, 2003-Ohio-3550, 2003 WL 21517986, at ¶ 45. In this case, the record *as created by the stipulations* was sufficient to reach this high plateau. But by failing to assert Kenton's due process rights, by failing to examine witnesses and to cross-examine the state's witnesses, and by depriving the trial court of the chance to see their demeanor, trial counsel, in effect, undermined the credibility of the record. Consequently, "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 91} Finding merit in each assignment of error, I must respectfully dissent.