[Cite as *State v. Scott*, 2013-Ohio-1559.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No.   98809

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## CLYDE SCOTT

DEFENDANT-APPELLANT

---

### JUDGMENT:
CONVICTIONS AFFIRMED;
SENTENCE VACATED; REMANDED
FOR RESENTENCING

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-557947

**BEFORE:**   Boyle, P.J., Blackmon, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:**    April 18, 2013

**ATTORNEY FOR APPELLANT**

Michael J. Manuszak
2905 Paxton Road
Shaker Heights, Ohio   44120

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Denise J. Salerno
Assistant County Prosecutor
The Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Clyde Scott, appeals his convictions and sentence. He raises three assignments of error for our review:

1. The trial court erred in overruling Apellant's Rule 29 Motion for Acquitttal where there was insufficient evidence to identify Appellant as the perpetrator of the crimes herein.

2. The trial court abused its discretion by imposing a 24 year consecutive prison sentence on the Appellant that was contrary to law, unduly harsh, and unsupported by the Record.

3. The trial court erred in not adequately and fully investigating Appellant's ongoing pro se complaint about the effectiveness of his court-appointed attorney who was defending him in a felony case and in failing to adequately preserve such investigation on the Record for the purpose of an effective appellate review.

{¶2} We affirm Scott's convictions, but vacate his sentence and remand for resentencing.

Procedural History and Factual Background

{¶3} Scott was indicted on 11 counts in January 2012, along with codefendant, Richard Grant, for two separate incidents of armed robbery occurring on the same day, within minutes of each other, against two victims. For the alleged acts against one victim, Marion Polk, Scott was charged with kidnapping in violation of R.C. 2905.01(B)(2); two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2); two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) and (3); and one count of theft in violation of R.C. 2913.02(A)(1). For the alleged acts against the other victim, Carlos Williams, Scott was charged with one count of kidnapping in violation of

R.C. 2905.01(B)(2); one count of felonious assault in violation of R.C. 2903.11(A)(2); one count of aggravated robbery in violation of R.C. 2911.01(A)(1); and one count of theft in violation of R.C. 2913.02(A)(1). Scott was also charged with having a weapon while under a disability in violation of R.C. 2923.13(A)(3). The kidnapping, aggravated robbery, and felonious assault charges carried one- and three-year firearm specifications. Scott pleaded not guilty to all the charges at his arraignment. The following facts were presented to a jury.

{¶4} Carlos Williams testified that late in the evening of December 26, 2011, he was walking on Clark Avenue, near West 25th Street, when he saw two guys walking toward him. He stated that one of the men "was tall, dark skinned with a beard, [and] was wearing black, like a black hoodie." Williams described the second man as "light skinned, shorter than the tall guy," and had "short hair." Williams identified the taller male in court as Scott.

{¶5} Williams testified that the two men flagged him down and asked him for marijuana. He told them that he did not have any. At that point, Williams said the shorter male grabbed his arm and "started going in his pants to reach for something," while Scott blocked his path "so [he] wouldn't take off running." The shorter man pulled a black gun out of his pocket and pointed it at Williams's face. Scott began rummaging through Williams's pockets. Scott took Williams's wallet, which was on a "wallet chain." Williams described a "wallet chain" as a chain that attaches to your wallet and connects to the belt loop of your jeans. Williams said after Scott took his

wallet, Scott "grabbed the gun from his partner." Scott pointed the gun in Williams's face, threatened to shoot him, and stated, "[t]his is how you do it." Williams told them that he did not have anything else.

{¶6} Williams testified that when a car drove by, he took off running across the street. He heard a gunshot as he was running. He thought that the men were shooting at him, but he did not get hit. He called 911.

{¶7} Williams said the entire robbery only lasted about two minutes. At the time of the robbery, it was dark and there were "not really" any street lights, but there was light coming from West 25th Street; it was not completely dark. Williams stated that the two men were close enough to him that they were "right there in my face," so he was able to see them even though it was dark. Williams testified that he was 100 percent positive that Scott was one of the two men who robbed him at gunpoint. He was also "very sure" that Scott was the one who took the gun and pointed it in his face because he was the "big, tall guy."

{¶8} Williams saw the two men run toward West 25th Street. Williams followed the two men. When Williams reached West 25th Street, he saw the two men "dragging another guy off in the cut." Williams recognized them because they were wearing the same clothes. Williams said they grabbed the other man "less than a minute" from the time they had robbed him. It was "pretty bright" where he saw the men on West 25th Street. Williams could not hear what they were saying, but he could see them "pulling" the victim while he was still on the phone with the police. Williams saw the victim run

from the two men and he heard three gunshots.  Although he could not see who fired the gun, he saw the victim fall in the street.  Williams was still on the phone with police.  Williams saw Scott run diagonally across West 25th Street, but did not see where the shorter man went.

{¶9} Williams said that police arrived within three to four minutes.  Williams got into the police cruiser.  He told the officer where he saw Scott run.  Williams said they already had the shorter male suspect in custody.  Williams identified his wallet, wallet chain, money, and house keys that the officers had obtained from the shorter male suspect.  Williams identified the shorter male suspect as one of the men who robbed him.  A minute or two later, the officers brought the second suspect to Williams and asked if he could identify him.  Williams identified Scott as the other man who robbed him.

{¶10} Marion Polk testified that around midnight on December 26, 2011, he was walking down the street when "two guys came out of a doorway on me with a gun."  He explained that the men were "two black dudes."  He further described the one with the gun as being "kind of big," with facial hair, and the other one was "kind of small."  He identified Scott in court as being the bigger man with the gun.

{¶11} Polk said that the men pulled him between two buildings.  Scott held the gun at Polk's head.  The shorter man was telling Scott to shoot Polk and beat him up.  Polk testified that the two men were "taking all of [his] stuff."  They took Polk's ring, wallet, keys, cigarettes, Chap Stick, and hat.  While the men were arguing whether to

shoot Polk, Polk took off running toward Clark Avenue. Polk heard someone say, "shoot him." Polk got shot in his buttocks.

{¶12} Polk testified that the street light was out; there was still "some light, but it was not as bright as usual." Polk was 100 percent positive that Scott was the man who had the gun that night. As Polk was running, he ran into a police car. He told police that he had been robbed and shot in the buttocks. While he was still at the hospital, police officers brought all of his "important stuff" to him, including his wallet and his keys. He identified a photo of all of the items that were taken from him that night.

{¶13} Polk identified a photo of a male wearing a white "hoodie." Polk did not recognize the male (it was Scott's codefendant), but said that the male was wearing Polk's "hoodie" that the robbers had just taken off of him during the robbery.

{¶14} Police officers responded to the area. One officer testified that he saw two males who matched the description. The two males were walking, but when they saw police, they took off running. Officers captured the shorter male suspect first. The shorter male suspect was wearing a white "hoodie." Officers saw that he had a "bulky" sock that contained evidence from the crimes, including both victims' wallets, Williams's wallet chain, and various other items that were taken from Polk. The officers photographed the evidence. After photographing the evidence, Williams identified the evidence that belonged to him.

{¶15} Another officer found Scott hiding in a dumpster. He drove Scott back to where the other officers had detained the other suspect. A gunshot residue test was done on Scott; it turned out to be positive.

{¶16} With respect to Polk, the jury found Scott guilty of one count of kidnapping, two counts of aggravated robbery, two counts of felonious assault, and one count of theft (Counts 1 through 6), with the gun specifications. With respect to Williams, the jury found Scott guilty of kidnapping, aggravated robbery, and theft (Counts 7, 8, and 10), with the gun specifications, but not guilty of felonious assault (Count 9). The jury also found Scott guilty of having a weapon while under a disability (Count 11).

{¶17} The trial court sentenced Scott to an aggregate 24 years in prison (12 years for each victim to be served consecutive to each other) and notified him that he would be subject to a mandatory term of five years of postrelease control upon his release from prison. It is from this judgment that Scott appeals.

## Sufficient Evidence

{¶18} In his first assignment of error, Scott argues that his convictions were not supported by sufficient evidence. Scott does not claim that the state did not present sufficient evidence on the element of the offenses. The only issue that Scott raises within this argument is that there was not sufficient evidence to identify him as one of the perpetrators of the crimes.

{¶19} When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶20} In support of his argument, Scott cites to *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In *Biggers*, the United States Supreme Court held that when reviewing suggestive identification procedures, the crucial inquiry is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199-200. The factors to be considered in evaluating the likelihood of misidentification include

> the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.*; *see also State v. Williams*, 73 Ohio St.3d 153, 163, 652 N.E.2d 721 (1995).

{¶21} In considering the factors set forth in *Biggers*, Scott argues that it was dark outside, therefore the victims could not see the perpetrators very well. He argues that it happened so quickly, their identification was not reliable. He further maintains that neither victim had ever seen their perpetrators before that night, nor did they see who was shooting at them. We find Scott's arguments unpersuasive.

{¶22} The state presented sufficient evidence of Scott's identity. Williams testified that the perpetrators were "right in his face." Although it was dark outside, he

could still see them. Not only could he see them, he followed them after he escaped. He saw them grab another victim, heard a gunshot, and saw the victim fall in the street. He followed them while he was still on the phone with the 911 operator. He was able to describe them to police and tell them where he saw Scott run after the second victim was shot. Police were able to apprehend both suspects within minutes of arriving on the scene. Williams identified Scott as one of his perpetrators very close in time to the robbery.

{¶23} Viewing this evidence in a light most favorable to the state, we find that the state presented sufficient evidence of Scott's identity.

{¶24} Scott's first assignment of error is overruled.

<u>Sentencing Issues</u>

{¶25} In his second assignment of error, Scott argues that the trial court's consecutive sentence of 24 years was contrary to law, unduly harsh, and not supported by the record.

{¶26} An appellate court must conduct a meaningful review of the trial court's sentencing decision. *State v. Johnson*, 8th Dist. No. 97579, 2012-Ohio-2508, ¶ 6, citing *State v. Hites*, 3d Dist. No. 6-11-07, 2012-Ohio-1892, ¶ 7. Specifically, R.C. 2953.08(G)(2) provides that our review of consecutive sentences is not an abuse of discretion. An appellate court must "review the record, including the findings underlying the sentence or modification given by the sentencing court." *Id.* If an appellate court clearly and convincingly finds either that (1) "the record does not support the sentencing

court's findings under [R.C. 2929.14(C)(4)]" or (2) "the sentence is otherwise contrary to law," then "the appellate court may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing." *Id.*

{¶27} According to R.C. 2929.14(C)(4):

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶28} According to this statute, a sentencing court must analyze whether consecutive sentences are necessary to protect the public, punish the offender, are not disproportionate, and make one additional finding. "A trial court satisfies this statutory requirement when the record reflects that the court has engaged in the required analysis and has selected the appropriate statutory criteria." *State v. Goins*, 8th Dist. No. 98256,

2013-Ohio-263, ¶ 10, citing *State v. Edmonson*, 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (1999).

{¶29} After a review of the sentencing hearing in this case, we find that we cannot even get to Scott's arguments relating to consecutive sentences because we find that the trial court improperly sentenced Scott on allied offenses of similar import. This was plain error.

{¶30} Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e. affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶31} At the beginning of the sentencing hearing in this case, the trial court explained that it was merging Counts 1, 4, 5, and 6 (kidnapping, aggravated robbery, and theft with respect to Polk); Counts 2 and 3 (felonious assault with respect to Polk); and Counts 7, 8, and 10 (kidnapping, aggravated robbery, and theft with respect to Williams). But there is nothing in the record to indicate that the state elected to proceed with any of the merged counts.

{¶32} After stating its findings, the trial court improperly proceeded to sentence Scott on each count, despite the fact that many of them were allied offenses of similar import. With respect to Polk, the trial court sentenced Scott to six years on Count 1

(kidnapping), six years on Count 2 (felonious assault), six years on Count 3 (felonious assault), nine years on Count 4 (aggravated robbery), nine years on Count 5 (aggravated robbery), and 12 months on Count 6 (theft). With respect to Williams, the trial court sentenced Scott to six years for Count 7 (kidnapping), nine years for Count 8 (aggravated robbery), and 12 months for Count 10 (theft). It then sentenced Scott to three years for Count 11 (having a weapon while under a disability).

{¶33} The trial court also merged all of the gun specifications for the base convictions relating to Polk and merged all of the gun specifications for the base convictions relating to Williams. But the trial court ordered that the gun specifications for each victim would not merge with each other, but would be served consecutive to and prior to each respective underlying conviction involving separate victims.

{¶34} The trial court then ordered that Counts 1 through 6 be served concurrently to each other for a total of nine years, but consecutive to the three years for the gun specifications, for a total of 12 years in prison. It then ordered that Counts 7 through 11 be served concurrent to each other for a total of nine years, but consecutive to the three years for the gun specifications, for a total of 12 years in prison. It then ordered that each 12-year term for each victim be served consecutive to one another, for a total of 24 years in prison.

{¶35} We find that the trial court erred in sentencing Scott because it sentenced him on allied offenses of similar import. Thus, although the court stated that it would merge the various offenses, it failed to do so. This was plain error. "[A] trial court is

prohibited from imposing individual sentences for offenses that constitute allied offenses of similar import." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 26. A trial court's duty to merge allied offenses at sentencing is mandatory, not discretionary. *Id.* The Ohio Supreme Court has held that the imposition of multiple sentences for allied offenses of similar import is plain error. *Id.* at ¶ 31, citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶ 96-102.

**{¶36}** As the Ohio Supreme Court explained in *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 17:

> A defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses. *Id.*, citing *Maumee v. Geiger*, 45 Ohio St.2d 238, 244, 344 N.E.2d 133 (1976). In fact, our precedent, including cumulative-punishment cases that predate the 1972 enactment of R.C. 2941.25(A), makes clear that a defendant may be found guilty of allied offenses but not sentenced on them. *See*, *e.g.*, *State v. Botta*, 27 Ohio St.2d 196, 203, 271 N.E.2d 776 (1971) ("Where * * * in substance and effect but one offense has been committed, a verdict of guilty by the jury under more than one count does not require a retrial but only requires that *the court not impose more than one sentence*" [emphasis added]); *Weaver v. State*, 74 Ohio St. 53, 77 N.E. 273 (1906), paragraph one of the syllabus (when there are multiple counts of violating liquor statutes, but only one offense, "it is error for the court, on a verdict of guilty under each count, *to inflict the penalties* prescribed by each of the said sections" [emphasis added]); *Woodford v. State*, 1 Ohio St. 427 (1853), paragraph three of the syllabus ("Where an offence forms but one transaction, and the indictment containing several counts on which the jury have returned a verdict of guilty, *it is error in the court to sentence on each count separately*" [emphasis added]).

**{¶37}** In *Whitfield*, the Ohio Supreme Court found that plain error existed because the trial court sentenced the defendant on allied offenses. The Supreme Court noted that

> [o]n remand, the trial court should fulfill its duty in merging the offenses for purposes of sentencing, but remain cognizant that R.C. 2941.25(A)'s

mandate that a 'defendant may be convicted of only one' allied offense is a proscription against sentencing a defendant for more than one allied offense.

*Id.* at ¶ 26.

**{¶38}** Here, we find plain error even though the trial court ordered that some of the allied offenses be served concurrently to each other. *See Whitfield* (trial court had sentenced the defendant concurrently on the allied offenses; court still found plain error); *Underwood* at ¶ 31 (when the sentences are to be served concurrently, a defendant is still prejudiced by having more convictions than are authorized by law).

**{¶39}** Accordingly, we vacate Scott's sentence and remand for a new sentencing hearing.

Motion for New Trial Counsel

**{¶40}** In his third assignment of error, Scott argues that the trial court erred when it denied his oral motion for new counsel without fully investigating his complaints.

**{¶41}** In *State v. Deal*, 17 Ohio St.2d 17, 244 N.E.2d 742 (1969), the Ohio Supreme Court held that when an accused raises a specific complaint regarding his dissatisfaction with counsel during the course of the trial, the trial court has an obligation to ensure that the record contains an adequate investigation of the complaint before continuing with the trial. *Id.* at 19-20. "The right to counsel is important enough that in a situation such as this a reviewing court should have sufficient information in the record to determine whether a claim of inadequate counsel is justified." Once a defendant makes the requisite showing, the trial court's failure to appoint new counsel "amounts to a denial

of effective assistance of counsel." *State v. Pruitt*, 18 Ohio App.3d 50, 57, 480 N.E.2d 499 (8th Dist.1984).

{¶42} Defendant bears the burden of demonstrating grounds for the appointment of new counsel. If a defendant alleges facts which, if true, would require relief, the trial court must inquire into the defendant's complaint and make the inquiry part of the record. *Deal* at 20. Although the inquiry may be brief and minimal, the inquiry must be made. *State v. King*, 104 Ohio App.3d 434, 437, 662 N.E.2d 389 (4th Dist.1995). Even that limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 68, citing *State v. Carter*, 128 Ohio App.3d 419, 423, 715 N.E.2d 223 (4th Dist.1998).

{¶43} "The decision whether or not to remove court appointed counsel and allow substitution of new counsel is addressed to the sound discretion of the trial court, and its decision will not be reversed on appeal absent an abuse of discretion." *Id.* The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶44} Generally, "an indigent defendant's right to counsel does not extend to counsel of the defendant's choice." *Thurston v. Maxwell*, 3 Ohio St.2d 92, 93, 209 N.E.2d 204 (1965). Rather, "[t]o discharge a court-appointed attorney, the defendant must show 'a breakdown in the attorney-client relationship of such magnitude as to jeopardize a defendant's right to effective assistance of counsel.'" *State v. Coleman*, 37

Ohio St.3d 286, 292, 525 N.E.2d 792 (1988), quoting *People v. Robles*, 2 Cal.3d 205, 215, 85 Cal.Rptr. 166, 466 P.2d 710 (1970).

**{¶45}** At a pretrial hearing in May 2012, defense counsel notified the court that Scott wanted to dismiss him as counsel. The trial court asked Scott why he wanted to dismiss his trial counsel. Scott replied: "I just feel like I'm being deprived of my rights, the things he tells me is false. He led me to believe that you're not being honorable. He tell me one thing and it's totally different thing, so I no longer trust him."

**{¶46}** The trial asked Scott if there was anything else. Scott replied, "no." The court denied his request, stating:

> Okay. That's not a good enough reason. Mr. Cavello is well known to this court and a very thorough attorney, does a very nice job in trial should we go that way. If you're unhappy with Mr. Cavello, you need to be detailed as to what actions he didn't take on your behalf, and what you've presented me with is not sufficient to have yourself appointed a new lawyer, Mr. Scott. You don't have a constitutional right to a lawyer of your choice.

**{¶47}** Scott then asked the trial court if he had the right to fire his attorney. The court responded that doing so would "further delay" his case. Scott stated, "But I'm not getting the legal advice that I feel like I need from the attorney I have now. So how do I go about getting rid of him and getting another one?" The court replied, "I can't help you with that one, Mr. Scott."

**{¶48}** On the day of trial in July 2012, Scott's trial counsel informed the court that he attempted to discuss with Scott bifurcating the charge of having a weapon while under disability, and have it be tried to the bench. Trial counsel stated, "I just asked him what he wanted me to tell the court in regards to whether he was going to bifurcate that and his

response was that he wanted me to tell the court nothing." The trial court asked Scott if it was true and if he was talking to his attorney. Scott replied, "I haven't been talking to him. I only seen him like four times since I've been here." The court then took a recess so that Scott's trial counsel could discuss bifurcation with him. The trial court stated: "I would suggest you talk to your attorney about the advantages of not having the jury hear that you were previously convicted. * * * But the decision is yours."

{¶49} When the court went back on the record, Scott's trial counsel informed the court that Scott did not want to bifurcate the charge. Scott's counsel then stated, "I hate to mention this, but at this point my client has instructed me * * * that his family wants to hire private counsel. I told him I thought that the court would probably not continue it at this point, but he asked me to direct it — or inform the court of that." The court asked Scott if it was true. Scott stated that it was and that he had talked to his mother the Friday before trial, which was beginning on a Monday, and said that his mother and sister told him that they were going to hire counsel for him. The court asked Scott how long he had been in jail. Scott replied that he had been in jail since December. The trial court denied his motion.

{¶50} Scott contends that the transcript evidences a clear communication break down between him and his trial counsel, "especially as it pertains to his inability to grasp the import of advice of counsel" regarding bifurcation. Scott asserts, "[i]t is clear that he did not grasp the significance of the options being communicated to him by his counsel."

{¶51} We find no abuse of discretion on the part of the trial court. The trial court considered appellant's concerns and complied with its obligation to ensure that the record contains an adequate investigation of the complaint before continuing with the trial. Upon hearing Scott's request for dismissal of counsel, the trial court inquired as to Scott's basis for dismissal and permitted Scott to speak freely in support of his complaint. Once the trial court understood the nature of appellant's arguments, it denied Scott's request because he was not specific enough. It further explained that Scott's trial counsel was a highly- qualified, competent, and well-respected attorney in the community.

{¶52} To the extent that Scott maintains that it is clear "he did not grasp the significance of the options being communicated to him by his counsel" regarding bifurcation, we agree that it does appear that Scott was not communicating with his counsel about the importance of bifurcating. Although as the trial court stated, the decision whether to bifurcate was ultimately Scott's decision.

{¶53} But Scott must still show prejudice; that is, would the outcome of his trial been different had he listened to his trial counsel and bifurcated the charge of having a weapon while under a disability. *Carter*, 128 Ohio App.3d 419, 423, 715 N.E.2d 223 (4th Dist.1998); *In re Lakes*, 149 Ohio App.3d 128, 2002-Ohio-3917, 776 N.E.2d 510, ¶ 47 (2d Dist.). We find that it would not have. The jury heard extensive evidence from both victims concerning their respective robberies. Williams followed his robbers and saw them grab Polk from the street. Williams stayed on the line with police until they arrived and advised police which way he saw the robbers go. Police were able to

apprehend both robbers within minutes of searching for them. Scott was found hiding in a dumpster. Williams was able to identify Scott as the larger male who robbed him, the one with the gun, and identify the shorter male suspect as well. And Williams's and Polk's property were found on Scott's codefendant when he was apprehended by police. Accordingly, we conclude that the jury would have convicted Scott even without knowing that he had a prior drug possession conviction. Indeed, the jury properly found Scott not guilty of felonious assault against Williams because Williams was not harmed by the robbers.

**{¶54}** Accordingly, Scott's third assignment of error is overruled.

**{¶55}** Convictions affirmed; sentenced reversed and vacated; this case is remanded for a new sentencing hearing.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY J. BOYLE, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., and
EILEEN T. GALLAGHER, J., CONCUR