[Cite as *In re J.M.M.*, 2019-Ohio-2873.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| J.M.M., J.A.M., JR., AND B.J.T. | : | |
| | : | **CASE NOS. 2019-P-0032**<br>**2019-P-0033**<br>**2019-P-0034** |

Civil Appeals from the Portage County Court of Common Pleas, Juvenile Division, Case Nos. 2018 JCF 1054, 2018 JCF 1055, and 2018 JCF 1056.

Judgment: Affirmed.

*Victor V. Vigluicci*, Portage County Prosecutor, and *Brandon J. Wheeler*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee).

*Cecily J. Mullins,* Megargel & Eskridge Co., LPA, 231 South Chestnut Street, Ravenna, OH 44266 (For Appellant).

*Shubhra N. Agarwal*, 3732 Fishcreek Road, Suite #288, Stow, OH 44224 (Attorney for Children).

*Jerrold Michael Kovolyan*, 218 West Main Street, Suite 100, Ravenna, OH 44266 (Guardian ad litem).

MARY JANE TRAPP, J.

{¶1} Appellant, Angela Conklin-Tucker ("Ms. Conklin-Tucker"), appeals the judgment of the Portage County Court of Common Pleas, Juvenile Division, which

granted Portage County Department of Job and Family Services ("PCDJFS") permanent custody of Ms. Conklin-Tucker's three children.

{¶2} Ms. Conklin-Tucker argues the trial court erred in finding that she stipulated to the termination of her parental rights without making an inquiry as to whether her stipulation was voluntarily, knowingly, and intelligently given. Ms. Conklin-Tucker also argues the trial court failed to follow the formalities of R.C. 5103.15(B)(1) when it accepted the voluntary permanent surrender stipulation on the record.

{¶3} After a thorough review of the record and relevant case law, we affirm the judgment of the Portage County Court of Common Pleas, Juvenile Division. Ms. Conklin-Tucker never stipulated to a voluntary permanent surrender of her parental rights. Instead, the court conducted a full permanent custody hearing pursuant to R.C. 2151.414 and determined, by clear and convincing evidence, that Ms. Conklin-Tucker was unable to care for the children and provide for their basic needs. Further, a voluntary permanent surrender agreement per R.C. 5103.15(B)(1) is inapplicable to a permanent custody hearing pursuant to R.C. 2151.414.

## Substantive and Procedural History

{¶4} Ms. Conklin-Tucker is the mother of three minor children whose custody are at issue in this case: a son, J.A.M. (DOB 9/24/09), and two daughters, J.M.M. (DOB 5/20/08) and B.J.T. (DOB 3/25/12). The father of J.A.M. and J.M.M., Mr. Justin Mosier ("Mr. Mosier"), is currently serving a life sentence for aggravated murder, aggravated robbery, and robbery. The father of B.J.T., Billy Tucker ("Mr. Tucker"), passed away in October of 2017.

{¶5} On January 1, 2017, the minor children were removed from Ms. Conklin-Tucker's custody and placed in the interim predispositional custody of PCDJFS. PCDJFS

2

filed a complaint and order for shelter care, explaining they received a report that Ms. Conklin-Tucker and her roommate, Eric Warner ("Mr. Warner"), were using and selling drugs out of their home, engaging in violence with each other in front of the children, and neglecting them. Ms. Conklin-Tucker admitted she was using J.A.M.'s prescription. She also tested positive for methamphetamines. The same day, the Portage County Sheriff's Office arrested her on a charge for aggravated possession of drugs. The children were removed to protect their health, safety, and well-being. Prior to his death, Mr. Tucker informed PCDJFS that he did not have the means to care for B.J.T., was unstable, and had issues with his mental health.

{¶6} The magistrate granted the order for interim and shelter care, and PCDJFS accordingly formulated a case plan with Ms. Conklin-Tucker and Mr. Tucker. The magistrate adjudicated the children as dependent on February 13, 2017.

{¶7} Several months later, maternal grandmother, Zina Kaminiski ("Ms. Kaminiski"), filed a motion to intervene and a motion for custody of J.A.M. and maternal aunt, Candy Vine ("Ms. Vine"), filed a motion to intervene and a motion for custody of J.M.M. and B.J.T. Paternal grandmother, Kathy Mosier ("Ms. Mosier"), also filed a motion to intervene and a motion for legal custody of all three children.

{¶8} The guardian ad litem ("GAL") filed her first report on November 7, 2017. The report informed the court that the children were placed with Ms. Kaminiski and Ms. Vine on June 18, 2017. Ten days later, both Ms. Kaminiski and Ms. Vine requested the children be removed from their homes. The children were placed back in foster homes. During those ten days, the GAL reported the children did not receive their medications properly. The police were called on two separate occasions because J.A.M. could not be located. Further, J.M.M. and J.A.M. were exhibiting sexually inappropriate behaviors with

3

each other. The children's behavior also regressed. The GAL found the homes of Ms. Kaminiski, Ms. Vine, and Ms. Mosier to all be appropriate. Further, all three stated they would be financially able to care for the children. Ms. Kaminiski and Ms. Vine receive disability payments, while Ms. Mosier receives Supplemental Security Income ("SSI"). Ms. Vine was dating the father of Ms. Conklin-Tucker's ex-roommate/boyfriend, Mr. Warner. The GAL also reported Ms. Conklin-Tucker was making some progress, having completed a treatment program, but she was still in a relationship with Mr. Warner.

{¶9} On November 16, 2017, the magistrate granted PCDJFS' motion for a six-month extension of temporary custody, and set Ms. Kaminiski's, Ms. Vine's, and Ms. Mosier's motions for custody of one or more of the children for a pre-trial conference on December 21, 2017.

{¶10} The GAL filed a second report with the court on the same day as the pre-trial conference. The GAL reported J.A.M. had been placed in the home of Ms. Mosier, but ten days after placement, Ms. Mosier dropped the child off at the home of a relative and asked for the child to be removed from her home. Ms. Mosier denied this. Ms. Conklin-Tucker was still in a relationship with Mr. Warner and continued to test positive for illegal substances. She was terminated from mental health treatment, continued to be unemployed, and lacked housing. The GAL recommended the six-month extension of temporary custody to PCDJFS be granted.

{¶11} Approximately six months later, on May 25, 2018, PCDJFS filed a second motion for a six-month extension of temporary custody. Ms. Conklin-Tucker had successfully completed another substance abuse treatment program in March of 2018, but continued to test positive for illegal substances. Further, she continued to lack appropriate housing and employment. The two girls were placed in separate foster

4

homes, and J.M.M. had been staying at the Christian Children's Home of Ohio since November 27, 2017. The court granted the six-month extension on June 28, 2018.

{¶12} On December 6, 2018, PCDJFS filed a motion for permanent custody of all three children since the dependent children had been in the temporary custody of PCDJFS for 12 or more months of a consecutive 22-month period. Ms. Conklin-Tucker had failed to complete her case plan and to address her financing, parenting, substance abuse, mental health, and stable housing issues.

{¶13} In February of 2019, the GAL filed a notice of conflict because she believed it was in the best interest of the children to be placed in the permanent custody of PCDJFS. The children, however, did not wish to be placed in foster homes or the permanent custody of the agency. The court granted the GAL's request to appoint a new GAL for the children and allow her to remain as the attorney for the children.

{¶14} In the interim and before the children's permanent custody hearing, Mr. Mosier filed a motion for legal custody seeking placement of his children in the legal custody of his mother, Ms. Mosier. Marcella A. Trask ("Ms. Trask"), a nonrelative, also filed a motion to intervene for custody of the children.

{¶15} At the hearing, both parents were present and represented by counsel. Also present were Ms. Mosier, Ms. Kaminiski, Ms. Vine, and Ms. Trask, along with a PCDJFS case worker, the GAL, and the children's attorney. The court overruled Ms. Trask's motion to intervene, finding her not prepared to argue since her motion did not comply with Civ.R. 24 and was untimely. PCDJFS entered 38 exhibits into evidence, which consisted of case plans, interim reports, the GAL reports, the magistrate's orders, and a Ravenna City Police Department incident report from November 26, 2017. The report

5

documented a custody dispute regarding J.A.M.'s grandfather, who informed the police Ms. Mosier told him she did not want custody of J.A.M.

{¶16} Ms. Conklin-Tucker and Mr. Mosier stipulated that the children had been in the temporary custody of PCDJFS for 12 or more months of a consecutive 22-month period and that they were unable to care for the children. Ms. Conklin-Tucker wanted the children to be placed in the legal custody of relatives, and Mr. Mosier wanted his mother, Ms. Mosier, to have legal custody. The case worker from PCDJFS, Ms. Kaminiski, Ms. Vine, Ms. Mosier, and Mr. Mosier testified at the hearing.

{¶17} The court found, by clear and convincing evidence, that Ms. Conklin-Tucker was dependent on drugs and unable to provide a safe, stable environment, housing, and provide the children with their basic needs. Mr. Mosier, serving a life sentence, was also unable to care for the children. The GAL recommended the children be placed in the permanent custody of PCDJFS. The court further found there were no appropriate relatives willing to take temporary custody, and that PCDJFS had made reasonable efforts to prevent the children's removal and finalize a permanent plan.

{¶18} There had been two failed placements with maternal grandmother, Zena Kaminski; one in an earlier case involving J.A.M. and J.M.M. in 2011, and the second was in this case involving J.A.M. only. PCDJFS also had concerns about an ongoing domestic violence issue between Ms. Kaminski and her husband, as well as an ongoing children services history with Ms. Kaminski.

{¶19} At the same time Ms. Kaminski had J.A.M. in this case, the maternal aunt, Ms. Vine, had J.M.M. and B.J.T. Ms. Kaminski and Ms. Vine returned the children to PCDJFS at the same time because of behavior issues.

6

{¶20} The paternal grandmother, Ms. Moiser, also had J.A.M. in her care for ten days. She called the maternal grandfather and told him to pick up the child. Since he did not feel comfortable having the child, he dropped the child off with the Ravenna police.

{¶21} The final kinship placement attempted was with Ms. Trask. The three children were removed from her home after a short period when the U.S. Marshalls appeared at her home with a warrant for Mr. Warner. Ms. Trask was also facing charges arising from the alleged harboring of Mr. Warner. One of the children revealed to a PCDJFS assessment worker that they were hiding Mr. Warner when the case worker came for home visits.

{¶22} In a detailed judgment entry of its analysis pursuant to R.C. 2151.414, the court ordered that the paternal rights and privileges of Ms. Conklin-Tucker and Mr. Mosier be permanently divested and terminated, and the children be placed in the permanent custody of PCDJFS for the purpose of adoption.

{¶23} Ms. Conklin-Tucker appeals, raising the following two assignments of error:

{¶24} "[1.] The trial court erred in finding that appellant stipulated to the termination of her parental rights without making inquiry.

{¶25} "[2.] The trial court erred when it effectively accepted appellant's voluntary surrender of her parental rights without adhering to and observing the formalities set forth in Ohio Revised Code Section 5103.15(B)(1)."

**Standard of Review**

{¶26} "It is well established that a parent's right to raise a child is an essential and basic civil right." (Citations omitted.) *In re T.B.*, 11th Dist. Lake No. 2008-L-055, 2008-Ohio-4415, ¶29. "The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." (Citations omitted.) *Id.*

7

"Based upon these principles, the Ohio Supreme Court has determined that a parent 'must be afforded every procedural and substantive protection the law allows.'" (Citations omitted.) *Id.*

{¶27} "R.C. 2151.414 sets forth the guidelines that a juvenile court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the juvenile court must schedule a hearing and, provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in longterm foster care.

{¶28} "Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (1) the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 out of 22 months], and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶29} "Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in

8

R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶30} "If the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 of 22 months], then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions are enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶31} "Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)[(1)] mandates that the juvenile court must consider all relevant factors, including but not limited to, the following: [a] the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; [b] the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; [c] the custodial history of the child; and [d] the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶32} "The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody

9

to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.* at ¶30-35, quoting *In re Lambert*, 11th Dist. Geauga No. 2007-G-2751, 2007-Ohio-2857, ¶70-75, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

**{¶33}** "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *Id.* at ¶36, citing *Lambert* at ¶75, citing *In re Jacobs*, 11th Dist. Geauga No. 99-G-2231, 2000 WL 1227296, 4 (Aug. 25, 2000).

### Stipulation to the Termination of Parental Rights

**{¶34}** In her first assignment of error, Ms. Conklin-Tucker argues the trial court erred to her prejudice in finding that she stipulated to the divestiture of her parental rights without conducting an inquiry to determine whether her stipulation was made knowingly, intelligently, and voluntarily.

**{¶35}** This contention is without merit because Ms. Conklin-Tucker did not stipulate to a permanent surrender of her parental rights.

### *Ms. Conklin-Tucker's Stipulation Was Not a "Permanent Surrender"*

**{¶36}** At the beginning of the hearing, Ms. Conklin stipulated that PCDJFS had custody of the children for 12 or more months of a consecutive 22-month period and that she was inappropriate to care for the children at that time. She requested that the children be placed in the legal custody of a relative rather than in the permanent custody of the agency. The court then engaged in the following colloquy with Ms. Conklin-Tucker and her attorney.

10

{¶37} "Ms. Conklin-Tucker's Counsel:  Your Honor, may it please the Court, we would stipulate as outlined by [counsel for PCDJFS].  We would ask the Court to place the children in the legal custody of a relative rather than in permanent custody of the agency.

{¶38} "The Court:  Okay, well, I'm just trying to get the 22 months.

{¶39} "Ms. Conklin-Tucker's Counsel:  Thank you, and we'll stipulate to all of those matters, your Honor.

{¶40} "The Court:  All right, and Angela, do you understand what that stipulation is?  You have to answer out loud, yes.

{¶41} "Ms. Conklin-Tucker:  Yes.

{¶42} "The Court:  You understand why you're here today in court for permanent custody?

{¶43} "Ms. Conklin-Tucker:  Yes.

{¶44} "The Court:  And you understand the effect that this has upon you?

{¶45} "Ms. Conklin-Tucker:  Yes.

{¶46} "The Court:  And the stipulation is voluntary on your part?

{¶47} "Ms. Conklin-Tucker:  Yes.

{¶48} "The Court:  No one's forced or coerced you?

{¶49} "Ms. Conklin-Tucker: No."

{¶50} As the above illustrates, Ms. Conklin-Tucker did not stipulate to a permanent surrender of her rights.  Rather, she made a limited factual stipulation that the children had been in the custody of PCDFJS for 12 or more of 22 consecutive months period and that she was unable to care for the children.  She had the opportunity to take the stand and testify on her own behalf, and her attorney chose to cross-examine

11

PCDJFS' caseworker, Ms. Hope Wagner, as well as Ms. Kaminiski and Ms. Vine. She clearly stated on the record that she did not want PCDJFS to have permanent custody of the children.

{¶51} This is not a case where a parent stipulated that permanent custody to a children services agency would be in the children's best interest and the court accordingly did not consider evidence on the parent's ability to parent them. *See, e.g., In re B.W.*, 9th Dist. Wayne No. 18AP0034, 2018-Ohio-4544, ¶5 (father signed a partial permanent surrender form and engaged in an extensive colloquy with both the court and his attorney before and after doing so; thus, the agency presented evidence only against the mother).

{¶52} The Second District Court of Appeals considered the issue of voluntary permanent surrender stipulations in a R.C. 2151.414 permanent custody hearing in *Ross v. Prater*, 2d Dist. Montgomery No. 16582, 1998 WL 655416 (Sept.11, 1998). Prior to the final hearing, the mother testified that she had an agreement to consent to permanent custody with the children services agency, and she did not want to contest the agency's motion. *Id.* at 1. On appeal, however, the mother argued the magistrate failed to comply with several statutes and rules, including Juv.R. 29(D), by failing to engage her in a voluntary, knowingly, and intelligently colloquy of her waiver of rights. *Id.* at 2-3.

{¶53} The Second District Court of Appeals held that the trial court did not approve the mother's agreement to consent to permanent custody proffered by her testimony. Rather, the trial court proceeded to determine the matter before it, the agency's R.C. 2151.413 motion for permanent custody, which was a matter entirely distinct from any voluntary surrender. The trial court followed the procedures for the motion before it that are set out in R.C. 2151.414. *Id.* at 3. The court concluded she did not make an admission for purposes of Juv.R. 29(D), because she did not tell the trial

12

court that it would be in the best interests of the children for custody to be granted to the agency. *Id.*

**{¶54}** In Ms. Conklin-Tucker's case, she did not surrender her parental rights. She requested that legal custody be granted to her relatives. A review of the record reveals the court conducted a full permanent custody hearing pursuant to R.C. 2151.414 to determine, by clear and convincing evidence, that she was unable to care for the children and provide for their basic needs. "Lacking the effect of a plea to a charge, a parent's admission in a dispositional hearing that his or her child's best interest would be served by permanent placement elsewhere than with the parent is not a matter that requires protections similar to those in Juv.R. 29(D). The admission is but one more article of testimonial evidence for the court to consider in resolving the best-interest question." *In re Lakes*, 149 Ohio App.3d 128, 2002-Ohio-3917, ¶71 (2d Dist.).

### *The Trial Court's Findings*

**{¶55}** More specifically, the trial court reviewed the factors of R.C. 2151.414, first finding pursuant to R.C. 2151.414(B)(1)(a)-(e), that the children had been in the PCDJFS' custody for 12 or more months of a consecutive 22-month period.

**{¶56}** Next, the trial court determined whether granting custody of the children to PCDJFS was in the children's best interest pursuant to R.C. 2151.414(D)(1). The court found Ms. Conklin-Tucker was dependent upon drugs and unable to provide a safe, stable environment and housing for the children or meet their basic needs. Further, she failed to complete her case plan objectives within a reasonable time. PCDJFS submitted evidence that reflected Ms. Conklin-Tucker repeatedly attempted to comply with the case plan, but that she was unable to complete various treatment programs. Moreover, even

when she did comply, she still tested positive for illicit substances. At the time of the hearing she was unemployed and did not have housing or transportation.

**{¶57}** Critically, Ms. Conklin-Tucker was convicted of aggravated possession of drugs, and had been using and selling methamphetamines out of her apartment around the children. Thus, the trial court properly found that R.C. 2151.414(E)(7)(c) applied: "The parent has been convicted of or pleaded guilty to * * * [a]n offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense[.]"

**{¶58}** Thus, the record reflects that the trial court found, by clear and convincing evidence under the statutory analysis of R.C. 2151.414, that Ms. Conklin-Tucker was unsuitable at a full and contested hearing on a motion for permanent custody. A voluntary permanent surrender stipulation was never made, and a Juv.R. 29(A) colloquy is simply not required.

**{¶59}** Ms. Conklin-Tucker's first assignment of error is without merit.

### *Ms. Conklin-Tucker's Stipulation Did Not Trigger R.C. 5103.15(B)(1)*

**{¶60}** In her second assignment of error, Ms. Conklin-Tucker argues the trial court erred to her prejudice when it accepted a permanent surrender stipulation on the record without observing the formalities required under R.C. 5103.15(B)(1).

**{¶61}** At the outset we note, as addressed above, that Ms. Conklin-Tucker did not stipulate to a permanent surrender, but rather, requested that the court grant legal custody to her relatives and not to grant permanent custody to PCDJFS.

14

**{¶62}** Secondly, R.C. 5103.15(B)(1) has no application in a permanent custody hearing pursuant to R.C. 2151.414. R.C. 5103.151(B)(1) provides that a parent, guardian, or other persons having custody of a child may enter into an agreement with a public children services agency or private child placing agency surrendering the child into the permanent custody of the agency. The agreement must be in writing and have the consent of the juvenile court. R.C. 5103.15(B)(1) and (C).

**{¶63}** "The Supreme Court of Ohio has indicated that a permanent surrender consent proceeding under R.C. 5103.15 is a private transfer of custody that is distinct from neglect and dependency proceedings, which are adversarial and are governed by separate statutes." *In re A.D.C.L.,* 2d. Dist. Darke Nos. 2015-CA-19 & 2015-CA-21, 2016-Ohio-1415, ¶44, citing *In re Miller*, 61 Ohio St.2d 184, 188-91 (1980); *Angle v. Children's Serv. Div., Holmes Cty. Welfare Dept.,* 63 Ohio St.2d 227, 230 (1980).

**{¶64}** Thus, "[a]n agreement by a child's parents or legal guardian to surrender a child to the permanent custody of a certified association or institution described in R.C. 5103.15 constitutes a contract where accepted by such association or institution and when voluntarily made without fraud or misrepresentation." *Id.* at ¶45, citing *Miller* at 189.

**{¶65}** "By the explicit terms of R.C. 5103.15(B)(1), an agreement to voluntarily place a child in the permanent custody of a children services agency may only be executed by parents 'having custody of a child[.]'" *In re A.P.*, 9th Dist. Medina No. 13CA0083-M, 2015-Ohio-206, ¶20 (at the time father purported to surrender his parental rights of his daughter, she was in the temporary custody of the children services agency. Because father did not have custody at the time he attempted to surrender his parental rights, he could not execute his surrender under R.C. 5103.15(B)(1)). *See also In re B.J.*,

15

5th Dist. Richland No. 18 CA 97, 2019-Ohio-1059, ¶17 (R.C. 5103.15 is not available to a parent when a children services agency already has temporary custody of the child).

{¶66} As there was no voluntary permanent surrender, either by stipulation or an agreement pursuant to R.C. 5103.15(B)(1), Ms. Conklin-Tucker's second assignment of error is without merit.

{¶67} The judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.


CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.