[Cite as *In re J.M.M.*, 2019-Ohio-2874.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| J.M.M. AND J.A.M., JR. | : | |
| | : | **CASE NOS. 2019-P-0040**<br>**2019-P-0041** |

Civil Appeals from the Portage County Court of Common Pleas, Juvenile Division, Case Nos. 2018 JCF 1054 and 2018 JCF 1055.

Judgment: Affirmed.

*Victor V. Vigluicci*, Portage County Prosecutor, and *Brandon J. Wheeler*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH  44266 (For Appellee).

*Seneca Konturas*, 125 S. Water Street, Suite 3/4, Kent, OH  44240 (For Appellant).

*Shubhra N. Agarwal*, 3732 Fishcreek Road, Suite # 288, Stow, OH  44224  (Attorney for Children).

*Jerrold Michael Kovolyan*, 218 West Main Street, Suite 100, Ravenna, OH  44266 (Guardian ad litem).

MARY JANE TRAPP, J.

{¶1}   Appellant, Justin Mosier, Sr. ("Mr. Mosier"), appeals the judgment of the Portage County Court of Common Pleas, Juvenile Division, which granted the Portage

County Department of Job and Family Services ("PCDJFS") permanent custody of Mr. Mosier's two children.

{¶2} Mr. Mosier raises three issues on appeal: (1) whether the trial court failed to properly inquire whether his stipulations were knowingly, intelligently, and voluntarily offered; (2) whether PCDJFS failed to meet its burden of proof by introducing insufficient evidence to support the trial court's determination; and (3) whether the trial court's judgment granting PCDJFS permanent custody is against the manifest weight of the evidence.

{¶3} After a thorough review of the record and relevant caselaw, we affirm the judgment of the Portage County Court of Common Pleas, Juvenile Division. Mr. Mosier never stipulated to a voluntary permanent surrender of his parental rights. He was, in fact, disqualified for custody because he is currently serving a life sentence for aggravated murder, aggravated robbery, and robbery. Further, a review of the evidence presented at the children's hearing for permanent custody reveals more than sufficient evidence from which the trial court could clearly and convincingly find that granting PCDJFS permanent custody was in the children's best interest. Lastly, the manifest weight of the evidence weighs heavily in support of the trial court's determination that there were no suitable relatives or nonrelatives who were willing to care for the children or meet their basic needs.

## Substantive and Procedural History

{¶4} Mr. Mosier is the father of two minor children whose custody are at issue in this case: a son, J.A.M. (DOB 9/24/09), and daughter, J.M.M. (DOB 5/20/08). The children's mother, Angela Conklin-Tucker ("Ms. Conklin-Tucker"), also has another

2

daughter, B.J.T. (DOB 3/25/12). Custody of all three children was considered by the trial court below and by this court in Ms. Conklin-Tucker's appeal in the companion case of *In re J.M.M., J.A.M., Jr., and B.J.T,* 11th Dist. Portage Nos. 2019-P-0032, 2019-P-0033, and 2019-P-0034.

{¶5} On August 30, 2010, Mr. Mosier was sentenced to life in prison with the possibility of parole after 25 years for aggravated murder, aggravated robbery, and robbery. The children were in the custody of Ms. Conklin-Tucker until January 1, 2017, when the children we placed in the interim predispositional custody of PCDJFS. Ms. Conklin-Tucker had been using and selling drugs out of her home, engaging in violence with her roommate/boyfriend in front of the children, and neglecting them. She had been using J.A.M.'s prescription and tested positive for methamphetamines. The same day PCDJFS took custody of the children, the Portage County Sheriff's Office arrested Ms. Conklin-Tucker on a charge for aggravated possession of drugs.

{¶6} The magistrate granted the order for interim and shelter care, and PCDJFS accordingly formulated a case plan with the mother. The magistrate adjudicated the children as dependent on February 13, 2017.

{¶7} Several months later, maternal grandmother, Zina Kaminiski ("Ms. Kaminiski"), filed a motion to intervene and a motion for legal custody of J.M.M., and maternal aunt, Candy Vine ("Ms. Vine"), filed a motion to intervene and a motion for legal custody of J.M.M. and B.J.T. Paternal grandmother, Kathy Mosier ("Ms. Mosier"), also filed a motion to intervene and a motion for legal custody of all three children.

{¶8} The guardian ad litem ("GAL") filed her first report on November 7, 2017. The report informed the court that the children were placed with Ms. Kaminiski and Ms.

3

Vine on June 18, 2017. Ten days later, both Ms. Kaminiski and Ms. Vine requested the children be removed from their homes. The children were placed back in foster homes. During those ten days, the GAL reported the children did not receive their medications properly. The police were called on two separate occasions because J.A.M. could not be located. Further, J.M.M. and J.A.M. were exhibiting sexually inappropriate behaviors with each other. The children's behavior also regressed. The GAL found the homes of Ms. Kaminiski, Ms. Vine, and Ms. Mosier to all be appropriate. Further, all three stated they would be financially able to care for the children. Ms. Kaminiski and Ms. Vine receive disability payments, while Ms. Mosier receives Supplemental Security Income (SSI). Ms. Vine was dating the father of Ms. Conklin-Tucker's ex-roommate/boyfriend, Mr. Warner. The GAL also reported Ms. Conklin-Tucker was making some progress, having completed a treatment program, but she was still in a relationship with Mr. Warner.

{¶9} On November 16, 2017, the magistrate granted PCDJFS' motion for a six-month extension of temporary custody and set Ms. Kaminski's, Ms. Vine's, and Ms. Mosier's motions for legal custody of one or more of the children for a pre-trial conference on December 21, 2017.

{¶10} The GAL filed a second report with the court on the same day as the pre-trial conference. The GAL reported J.A.M. had been placed in the home of Ms. Mosier, but ten days after placement, Ms. Mosier dropped the child off at the home of a relative and asked for the child to be removed from her home. Ms. Mosier denied this. Ms. Conklin-Tucker was still in a relationship with Mr. Warner and continued to test positive for illegal substances. She was terminated from mental health treatment, continued to be

4

unemployed, and lacked housing. The GAL recommended the six-month extension of temporary custody to PCDJFS be granted.

{¶11} Approximately six months later, on May 25, 2018, PCDJFS filed a second motion for a six-month extension of temporary custody. Ms. Conklin-Tucker had successfully completed another substance abuse treatment program in March of 2018, but continued to test positive for illegal substances. Further, she continued to lack appropriate housing and employment. The two girls were placed in separate foster homes, and J.M.M. had been staying at the Christian Children's Home of Ohio since November 27, 2017. The court granted the six-month extension on June 28, 2018.

{¶12} On December 6, 2018, PCDJFS filed a motion for permanent custody of all three children since the dependent children had been in the temporary custody of PCDJFS for 12 or more months of a consecutive 22 month period. Ms. Conklin-Tucker had failed to complete her case plan and to address her financing, parenting, substance abuse, mental health, and stable housing issues.

{¶13} In February of 2019, the GAL filed a notice of conflict because she believed it was in the best interest of the children to be placed in the permanent custody of PCDJFS. The children, however, did not wish to be placed in foster homes or the permanent custody of the agency. The court granted the GAL's request to appoint a new GAL for the children and allow her to remain as the attorney for the children.

{¶14} In the interim and before the children's permanent custody hearing, Mr. Mosier filed a motion seeking placement of his children in the legal custody of his mother, Ms. Mosier. Marcella A. Trask ("Ms. Trask"), a nonrelative, also filed a motion to intervene and a motion for legal custody of the children.

5

{¶15} At the hearing, both parents were present and represented by counsel. Also present were Ms. Mosier, Ms. Kaminiski, Ms. Vine, and Ms. Trask, along with a PCDJFS case worker, the GAL, and the children's attorney. The court overruled Ms. Trask's motion to intervene, finding her not prepared to argue since her motion did not comply with Civ.R. 24 and was untimely. PCDJFS entered 38 exhibits into evidence, which consisted of case plans, interim reports, the GAL reports, the magistrate's orders, and a Ravenna City Police Department incident report from November 26, 2017. The report documented a custody dispute regarding J.A.M.'s grandfather, who informed the police Ms. Mosier told him she did not want custody of J.A.M.

{¶16} Ms. Conklin-Tucker and Mr. Mosier stipulated that the children had been in the temporary custody of PCDJFS for 12 or more months of a consecutive 22-month period and that they were unable to care for the children. Ms. Conklin-Tucker wanted the children to be placed in the legal custody of relatives, and Mr. Mosier wanted his mother, Ms. Mosier, to have legal custody. The case worker from PCDJFS, Ms. Kaminiski, Ms. Vine, Ms. Mosier, and Mr. Mosier testified at the hearing.

{¶17} The court found, by clear and convincing evidence, that Mr. Mosier was disqualified for custody under R.C. 2151.414(E)(6), (7), (12), and (13) because he is serving a life sentence at Southern Ohio Correctional Facility for a 2010 conviction for aggravated murder, aggravated robbery, and robbery. Ms. Conklin-Tucker was dependent on drugs and unable to provide a safe, stable environment, housing, or provide the children with their basic needs. The GAL recommended the children be placed in the permanent custody of PCDJFS. The court further found there were no appropriate

6

relatives willing to take temporary custody, and that PCDJFS had made reasonable efforts to prevent the children's removal and finalize a permanent plan.

{¶18} There had been two failed placements with maternal grandmother, Zena Kaminski; one in an earlier case involving J.A.M. and J.M.M. in 2011, and the second was in this case involving J.A.M. only. PCDJFS also had concerns about an on-going domestic violence issue between Ms. Kaminski and her husband, as well as an on-going children services history with Ms. Kaminski.

{¶19} At the same time Ms. Kaminski had J.A.M. in this case, the maternal aunt, Ms. Vine, had J.M.M. and B.J.T. Ms. Kaminski and Ms. Vine returned the children to PCDJFS on the same day because of behavior issues.

{¶20} The paternal grandmother, Ms. Moiser, also had J.A.M. in her care for ten days. She called the maternal grandfather and told him to pick up the child. Since he did not feel comfortable having the child, he dropped the child off with the Ravenna police.

{¶21} The final kinship placement attempted was with Ms. Trask. The three children were removed from her home after a short period when the U.S. Marshalls appeared at her home with a warrant for Mr. Warner. Ms. Trask was also facing charges arising from the alleged harboring of Mr. Warner. One of the children revealed to a PCDJFS assessment worker that they were hiding Mr. Warner when the case worker came for home visits.

{¶22} In a detailed judgment entry of its analysis pursuant to R.C. 2151.414, the court ordered that the parental rights and privileges of Ms. Conklin-Tucker and Mr. Mosier be permanently divested and terminated, and the children be placed in the permanent custody of PCDJFS for the purpose of adoption.

7

{¶23} Mr. Mosier appeals, raising the following three assignments of error:

{¶24} "[1.] The trial court erred in failing to properly inquire of the parties with respect to their understanding of the parental rights being relinquished by the parents of J.M.M. and J.A.M. upon stipulation to elements partially satisfying the requirements of R.C. 2151.414.

{¶25} "[2.] The trial court committed prejudicial error when it failed to dismiss PCDJFS' Motion for Permanent Custody at the conclusion of PCDJFS' case-in-chief whereupon insufficient evidence had been presented by PCDJFS such that the agency did not meet its burden of proof.

{¶26} "[3.] The trial court erred when it granted permanent custody to PCDJFS against the manifest weight of the evidence."

### Standard of Review

{¶27} "It is well established that a parent's right to raise a child is an essential and basic civil right." (Citations omitted.) *In re T.B.*, 11th Dist. Lake No. 2008-L-055, 2008-Ohio-4415, ¶29. "The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." (Citations omitted.) *Id.* "Based upon these principles, the Ohio Supreme Court has determined that a parent 'must be afforded every procedural and substantive protection the law allows.'" (Citations omitted.) *Id.*

{¶28} "R.C. 2151.414 sets forth the guidelines that a juvenile court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the juvenile court must schedule a hearing and, provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing

8

agency that has temporary custody of the child or has placed the child in longterm foster care.

{¶29} "Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (1) the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 out of 22 months], and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody or (4) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶30} "Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶31} "If the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 of 22 months], then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court

9

must consider all relevant evidence before making this determination.  The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions are enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶32}  "Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest.  In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(3) mandates that the juvenile court must consider all relevant factors, including but not limited to, the following:  [a] the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; [b] the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; [c] the custodial history of the child; and [d] the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶33}  "The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present.  Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established."

*Id.* at ¶30-35, quoting *In re Lambert*, 11th Dist. Geauga No. 2007-G-2751, 2007-Ohio-2857, ¶70-75, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

**{¶34}** "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *Id.* at ¶36, citing *Lambert* at ¶75, citing *In re Jacobs*, 11th Dist. Geauga No. 99-G-2231, 2000 WL 1227296, 4 (Aug. 25, 2000).

### Stipulation to the Termination of Parental Rights

**{¶35}** In his first assignment of error, Mr. Mosier argues the trial court erred in failing to confirm his understanding of the issues to which he was stipulating, and further, by failing to engage him in a colloquy to ensure his rights were being voluntarily, knowingly, and intelligently waived.

**{¶36}** At the beginning of the hearing, Mr. Mosier stipulated that PCDJFS had custody of the children for 12 or more months out of a consecutive 22 month period and requested that the children be placed in the legal custody of his mother rather than in the permanent custody of the agency.

**{¶37}** This "stipulation" was not a voluntary permanent surrender of parental rights. Mr. Mosier was automatically disqualified pursuant to R.C. 2151.414(E)(6), (7), (12), and (13) from custody as a result of his conviction for aggravated murder, aggravated robbery, and robbery. The court was not required to engage Mr. Mosier in a colloquy because he was not waiving any of his rights in a voluntary permanent surrender.

**{¶38}** R.C. 2151.414(E) states, in relevant part: "* * * If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section [agency motion for permanent custody] * * * that one or more of the following exist as to

11

each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

{¶39} * * *

{¶40} "(6) The parent has been convicted of or pleaded guilty to an offense * * * under * * * section 2911.01 [or] R.C. 2911.02 [robbery and aggravated robbery, respectively] * * * of the Revised Code.

{¶41} "(7) The parent has been convicted of or pleaded guilty to one of the following:

{¶42} "(a) An offense under section 2903.01 [aggravated murder] * * * of the Revised Code[.]

{¶43} * * *

{¶44} "(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

{¶45} "(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child."

{¶46} Mr. Mosier's acknowledgement that the children had been in PCDJFS' custody for 12 or more months in a 22 month period is not a waiver of parental rights. Mr. Mosier was given the opportunity to testify and expressed to the court he believed it was in the children's best interest to be placed in the legal custody of his mother.

{¶47} "Lacking the effect of a plea to a charge, a parent's admission in a dispositional hearing that his or her child's best interest would be served by permanent

12

placement elsewhere than with the parent is not a matter that requires protections similar to those in Juv.R. 29(D). The admission is but one more article of testimonial evidence for the court to consider in resolving the best-interest question." *In re Lakes*, 149 Ohio App.3d 128, 2002-Ohio-3917, ¶71 (2d Dist.).

{¶48} Mr. Mosier's first assignment of error is without merit.

## Sufficiency of the Evidence

{¶49} In his second assignment of error, Mr. Mosier contends PCDJFS failed to introduce sufficient evidence and the trial court subsequently failed to consider each of the provisions of R.C. 2151.141(D)(1). Mr. Mosier specifically points to the fact that PCDJFS only presented the testimony of one witness, the children's caseworker, Ms. Wagner.

{¶50} We disagree with Mr. Mosier's contention since a thorough review of the evidence and testimony presented at trial and the court's well-reasoned 21-page judgment entry reveals the court considered each of the five requisite factors of R.C. 2151.141(D), and that each finding is supported by clear and convincing evidence.

{¶51} At the outset, we note that PCDJFS did not just introduce the testimony of one witness, but also introduced 38 exhibits into evidence, which detailed the history of the case.

{¶52} As to the trial court's analysis and whether it is supported by clear and convincing evidence, R.C. 2151.414(D)(1) provides:

{¶53} "In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

13

{¶54} "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶55} "(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶56} "(c) The custodial history of the child * * *;

{¶57} "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶58} "(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶59} With regard to these factors, the court made the following findings on each child:

{¶60} J.M.M. has a bond with her mother. Her father has been incarcerated since she was an infant. She has received counseling and treatment at Village Network Foster Home since January 5, 2017. After being removed from the custody of her mother, J.M.M. was placed with a therapeutic foster family for six months. She was then placed with her maternal aunt, Ms. Vine, for ten days. Ms. Vine returned her to the agency and J.M.M. was again placed with a foster family and the Village Network Foster Home. From October 30, 2018 to December 5, 2018, J.M.M. was placed with Ms. Trask until she was removed and again placed with the Village Network Foster Family and a foster family. J.M.M. has been diagnosed with post-traumatic stress disorder and attention deficit and

14

hyperactivity disorder. She is on several medications. Her foster family ensures she takes her medications regularly, and she has bonded with them.

{¶61} Both Ms. Wagner and the GAL reported that J.M.M. expressed that she wanted to live with her father in prison. When the GAL asked her for another choice, she stated her mother or "aunt," Ms. Trask. When asked by the GAL if she would like to live with her current foster mother, she said she would. The GAL opined that it did not seem that J.M.M. was old enough to understand what placement means.

{¶62} J.A.M. shares a bond with his mother and has no meaningful relationship with his father. When he was removed from the custody of his mother in January of 2017, he was placed with Home for Kids, Inc. until June 7, 2017. He was then placed with his maternal grandmother, Ms. Kaminiski, who returned him to the custody of PCDJFS after ten days. J.A.M. returned to Home for Kids, Inc. until November 16, 2017. He was then placed in the custody of Ms. Mosier and removed ten days later, on November 26, 2017. J.A.M. was then placed with Christian Children's Home of Ohio until February 5, 2018. In February of 2018, J.A.M. was placed with Ms. Trask until he was removed approximately ten months later on December 5, 2018, whereupon he was placed with the Village Network Foster Family. Finally, he was placed with a foster family in Parma, Ohio. J.A.M. suffers from post-traumatic stress disorder, attention deficit and hyperactivity disorder, and other behavioral disorders. At the time of the hearing, he was seeing a therapist, a certified psychologist, and undergoing pharmacological management.

{¶63} Ms. Wagner testified J.A.M. expressed that he would like to stay with Ms. Trask but goes back and forth on the issue. J.A.M. expressed the same wishes to the GAL. He wanted to stay with his mother or Ms. Trask, but would not mind staying with

his current foster father. The GAL reported that J.A.M. also expressed confusion as to what placement meant, and the GAL was not entirely sure he was old enough to understand what was going on entirely.

{¶64} J.A.M. was taken out of the custody of Ms. Trask when PCDJFS (by way of a phone call from the Mahoning Township Police Department) discovered Ms. Trask was housing Mr. Wagner, Ms. Conklin-Tucker's ex-roommate/boyfriend, who was a wanted fugitive with an active arrest warrant. An assessment worker for PCDJFS did an interview, and PCDJFS determined it was not in the children's best interest to go to Ms. Trask's home. Ms. Trask was later charged with harboring a fugitive.

{¶65} Ms. Kaminiski, Ms. Vine, and Ms. Mosier also testified, and PCDJFS' attempted placements with them were well-documented by case reports, interim reports, the magistrate's dispositional orders, the GAL's reports, and a police report.

{¶66} The court found that J.A.M. was removed from the custody of Ms. Kaminiski due to her inability to handle his behaviors. At the time of the hearing, she was also working on another case plan with another grandson, which was not going well. While the children were with Ms. Kaminiski, the police were called on several occasions to deal with J.A.M. Thus, the court concluded she could not provide a safe and stable home. In addition, she was unable to financially care for J.A.M. and his special needs.

{¶67} Ms. Vine also had placement of the children, who were removed due to her inability to handle their behaviors. She had only a one bedroom apartment and did not have sufficient resources to provide for the basic needs of the children. Ms. Vine also had medical issues and no transportation.

{¶68} On June 28, 2017, PCDJFS received a call from Ms. Kaminiski and Ms. Vine that the children were unmanageable and acting out sexually. Ms. Kaminiski and Mrs. Vine testified that it was Ms. Wagner who actually demanded they return the children and that Ms. Wagner was unavailable when they asked for subsequent kinship placement and assistance. The court found the recollections of Ms. Vine and Ms. Kaminiski to be general, vague, and almost identical. Ms. Wagner testified "to dates certain and was precise as to when Ms. Vine and Ms. Kaminiski returned the children." Further, Ms. Wagner sent each woman a letter indicating they were inappropriate for custody or placement. The court found Ms. Wagner's testimony on this issue more credible.

{¶69} Ms. Mosier could obtain housing for the children with a Section 8 voucher and her apartment was clean. She suffered from health issues and did not have transportation or sufficient finances to care for the children. J.A.M. was removed from Ms. Mosier's home due to an incident where she claimed to have been drugged by her former daughter-in-law. Ms. Conklin-Tucker's father called the Ravenna City Police Department to report Ms. Mosier's distress. Ms. Mosier also told the magistrate that she did not want to be considered for placement or participate in further hearings, but subsequently she changed her mind.

{¶70} Quite clearly, as demonstrated by the record before us, the trial court, pursuant to each factor of R.C. 2151.414(D)(1), considered much more than just the testimony of a single witness. The record reveals clear and convincing evidence that details the children's case histories, their interaction with each other as well as parents, relatives, and foster parents, the wishes of the children, their custodial history, their need

17

for a legally secure permanent placement, and whether that type of placement could be achieved without a grant of permanent custody to PCDJFS.

**{¶71}** Mr. Mosier's second assignment of error is without merit.

### Manifest Weight of the Evidence

**{¶72}** In his last assignment of error, Mr. Mosier contends the trial court's decision to grant permanent custody to PCDJFS is against the manifest weight of the evidence because the record weighs heavily in favor of a finding that legal custody should have been granted to the children's relatives, specifically Ms. Mosier.

**{¶73}** "In cases involving the termination of parental rights, an appellate court applies to the civil manifest weight of the evidence standard of review." *In re M.B.*, 11th Dist. Ashtabula No. 2017-A-0024, 2017-Ohio-7293, ¶37, citing *In re D.H.,* 11th Dist. Geauga No. 2007-G-2759, 2007-Ohio-3337, ¶20-21. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.,* 50 Ohio St.2d 279 (1978), syllabus.

**{¶74}** "It is well-settled that when assessing the credibility of witnesses, '[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.' * * * Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." (Citations omitted.) *State v. Rice,* 11th Dist. Lake Nos. 2018-L-065 & 2018-L-066, 2019-Ohio-1415, ¶84.

{¶75} As the above review of the evidence indicates, the manifest weight of the evidence supports the trial court's finding that it was in the best interest of the children to be permanently placed in the custody of PCDJFS. PCDJFS repeatedly attempted to place the children in the homes of relatives and next-of-kin and to implement a case plan with Ms. Conklin-Tucker, but there were no relatives that were either willing and/or able to care for the children. The end result was that the children were living in an unstable environment and needed a secure, permanent, loving home.

{¶76} Mr. Mosier's third assignment of error is without merit.

{¶77} The judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.


CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.